**The Wolf Law Firm, LLC**
 1520 U.S. Hwy 130, Suite 101
 North Brunswick, NJ  08920
(732) 545-7900 / fax: (732) 545-1030

**The Law Office of**
**Christopher J. McGinn**
75 Raritan Ave., Suite 220
Highland Park, NJ 08904
(732) 937-9400 / fax: (800) 931-2408

**Williams Cuker Berezofsky**
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
(856) 667-0500 / fax: (856) 667-5133

**Berns Weiss LLP**
100 N. 18th Street, Suite 300
Philadelphia, PA 19103
(267)-202-0749/ fax:  (818)-999-1500

*Attorneys for Plaintiff and the putative class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARGARET KORROW, on behalf of herself and others similarly situated,<br><br>        Plaintiff<br><br>    vs.<br><br>AARONS, INC. and John Does 1-25<br><br>        Defendant. | Civil Action<br><br>Case No. 3:10-06317-MAS-LHG<br><br>FILED UNDER SEAL |

## PLAINTIFF'S BRIEF IN SUPPORT OF CROSS-MOTION FOR ORDER GRANTING CLASS CERTIFICATION AND IN OPPOSITION TO DEFENDANT'S MOTION TO DENY CLASS CERTIFICAITON

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................II

INTRODUCTION AND CLASS DEFINITION................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

STATEMENT OF PROCEDURAL HISTORY.................................................................. 5

SUMMARY OF CLASS CLAIMS ................................................................................... 6

LEGAL ARGUMENT ................................................................................................... 12

    I.    THE PROPOSED CLASS AND SUB-CLASSES SATISFY RULE 23(A)'S REQUIREMENTS. ......... 12

        A.    *Class and Sub-Class Membership is Readily Ascertainable.* ..................................... 12

        B.    *The Class and Sub-Classes Satisfy Rule 23(a)(1)-(4).* ............................................... 13

            1.    The Class and Sub-Classes are Sufficiently Numerous. ........................................... 13

            2.    The Class and Sub-Classes' Claims Raise Common Questions of Law and Fact.... 15

            3.    Plaintiff's Claims are Typical of the Class and Sub-Classes. .................................. 18

            4.    Plaintiff and Counsel Will Adequately Represent the Class and Sub-Classes. ........ 21

        C.    *Aaron's' Arguments for Denial of Class Certification Based Upon Rule 23(a) Fail...* 22

            1.    Ascertainability ....................................................................................................... 22

            2.    Commonality............................................................................................................ 26

            3.    Typicality and Adequacy of Representation............................................................ 28

    II.    THE CLASS AND SUB-CLASSES SATISFY ALL REQUIREMENTS OF RULE 23(B)(3). ............. 36

        A.    *The Common Issues of Law and Fact Predominate as to All of Plaintiff's and the Class's and Sub-Classes' Claims.* ................................................................................ 36

            1.    Common Questions Predominate With Respect to the Class Claims Under TCCWNA. ............................................................................................................... 36

            2.    Common Questions Predominate With Respect to the Sub-Class Claims Under the CFA. ........................................................................................................................ 37

            3.    Aaron's' Arguments Against Finding That Common Issues Predominate Fail as a Matter of Law and Fact............................................................................................ 39

         B.    *A Class Action is Superior to Other Methods of Proceeding, as There is No Realistic Alternative to a Class Action for Class Members' Small-Value Statutory Claims.* .............. 41

        C.    *Aaron's' Arguments Against Finding Superiority Based on its Possible Assertion of Unspecified Counterclaims Against Class Members Fails as a Matter of Law and Fact.* .... 42

            1.    Aaron's' Speculative, Unfiled Counterclaims Cannot Be Used to Undermine Class Certification. ........................................................................................................... 44

            2.    Aaron's' Threatened Counterclaim is Not Compulsory. ........................................ 47

            3.    Even if They Were Filed, the Court Should Decline to Exercise Jurisdiction Over Any State-Law Counterclaim. ................................................................................ 50

            4.    Even if Relevant, Aaron's' Claims Against Absent Class Members Would Be More Properly Addressed at the Damages Stage After Class-Wide Liability is Determined.... 53

            5.    Aaron's' Hired Expert's Arguments Against Finding Superiority are Equally Baseless. ................................................................................................................ 55

CONCLUSION.............................................................................................................. 56

## TABLE OF AUTHORITIES

**Cases**

*Agostino v. Quest Diagnostics*, 256 F.R.D. 437 (D.N.J. 2009) ..................................... 12

*Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008) ................................. 33, 45

*Amchem Prod's, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................... 36

*Ayres v. National Credit Mgmt Corp.*, 1991 U.S. Dist. LEXIS 5629 (E.D. Pa. 1991) ............... 48

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) .......................................... 16, 27, 33, 43

*Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287 (D.N.J. 2007) ......................... 31

*Barrow v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347 (D.N.J.2006) ........... 9

*Beard v. King Appliance Co.*, 61 F.R.D. 434 (E.D. Va. 1973) ................................... 41

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ........................................... 19

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ...................................... 39

*Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 964 A.2d 741 (2009) ......................... 38

*Brady v. C.F. Schwartz Motor Co.*, 723 F. Supp. 1045 (D. Del. 1989) ......................... 48

*C.I.R. v. Bosch's Estate,* 387 U.S. 456 (1967) .............................................. 10

*Cabrera v. Courtesy Auto, Inc.*, 192 F. Supp. 2d 1012 (D. Neb. 2002) ......................... 48

*Carnegie v. Household Int'l, Inc.*, 376 F. 3d 656 (7th Cir. 2004) ............................ 42

*Casida v. Sears Holdings Corp.*, 2012 U.S. Dist. LEXIS 111599 (E.D. Cal. Aug. 8, 2012) ........ 2

*Channell v. Citicorp*, 1996 U.S. Dist. LEXIS 14506, 1996 WL 563536 (N.D. Ill. September 27, 1996) .................................................................. passim

*Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867 (1984) ........................... 50

*Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454 (1994) ............................ 35, 47

*Donson Stores, Inc. v. American Bakeries Co.*, 58 F.R.D. 485 (S.D.N.Y. 1973) ............... 45, 48

*Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008) ......................... 7, 36

*Eisenberg v. Gagnon,* 766 F.2d 770 (3d Cir. 1985) ......................................... 14, 36

*Flores v. Anjost Corp.*, 284 F.R.D. 112 (S.D.N.Y. 2012) ................................... 13, 23

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) ....................... 33

*Gunnells v. Healthplan Serv's, Inc.*, 348 F.3d 417 (4th Cir. 2003) ......................... 32

*Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir. 1974) ................... 40, 41, 42

*Heaven v. Trust Co. Bank*, 118 F.3d 735 (11th Cir. 1997) ................................... 45

*Houbigant, Inc. v. Federal Ins. Co.*, 374 F.3d 192 (3d Cir. 2004) ........................... 10

*In Re Community Bank of No. Va.*, 418 F.3d 277 (3d Cir.2005) ............................... 36

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332 (D.N.J. 1997) ........... 41

*In re Prudential Ins. Co. of Am. Sales Pract's Litig.*, 148 F.3d 283 (3d Cir. 1998) .............. 16, 19

*In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D. Pa. 1976) ...................... 49

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583 (N.D. Cal. 2010), amended in part, 2011 U.S. Dist. LEXIS 84476, 2011 WL 3268649 (N.D. Cal., July 28, 2011) ................ 2

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ......................... 41

*Johnson v. Aronson Furniture Co.*, 1998 U.S. Dist. LEXIS 14454, 1998 WL 641342 (N.D. Ill. Sept. 11, 1998) ................................................................ 45, 46, 47

*Kent Motor Cars, Inc. v. Reynolds and Reynolds, Co.*, 207 N.J. 428, 25 A.3d 1027 (N.J. 2011) .. 9

*Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983) ...................... 36

*Lee v. Carter-Reed Co., LLC*, 203 N.J. 496, 4 A.3d 561 (2010) ............................... 38

*Lewis v. Curtis*, 671 F.2d 779 (3d Cir. 1982) .......................................... 21, 28, 31, 40

*Lewis v. Riddle*, 1998 U.S. Dist. LEXIS 20465 (WD La., 1998) ............................... 40

*Maldonado v. Houstoun*, 177 F.R.D. 311 (E.D. Pa. 1997) ...................................... 14

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) .................................................... 12

*McGarvey v. Penske Automotive Group, Inc.*, 639 F. Supp. 2d 450 (D.N.J.2009) ........................ 9

*New Directions Treatment Serv's v. City of Reading*, 490 F.3d 293 (3d Cir. 2007) .............. 28, 31

*New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 842 A.2d 174 (App.Div. 2003) ........................................................................................................................................ 38

*O'Sullivan v. Countrywide Home Loans, Inc.*, 202 F.R.D. 504 (S.D. Tex. 2001)........................ 45

*Passeggio v. Cosmetique Inc.*, 1999 U.S. Dist. LEXIS 7607 (E.D.N.Y. Apr. 30, 1999) ............ 40

*Perez v. Rent-a-Center* 186 N.J. 188, *clarified*, 188 N.J. 215, 902 A.2d 1232 (2006).......... passim

*Perry v. Beneficial Fin. Co. of N.Y., Inc.*, 81 F.R.D. 490 (W.D.N.Y. 1979) .................. 25, 26, 40

*Peterson v. United Accounts, Inc.*, 638 F.2d 1134 (8th Cir. 1981)............................................... 48

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................................... 42

*Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978) .................................................. 45, 53, 54

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159 (11th Cir. 2010) ................................................................................................................................................ 36

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) ................................................... 16

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) .................................................. 27

*Summerfield v. Equifax Info. Serv's, LLC*, 264 F.R.D. 133 (D.N.J. 2009)................................. 31

*Szczubelek v. Cendant Mortg. Corp.*, 215 F.R.D. 107 (D.N.J. 2003).......................................... 31

*United Consumer Financial Services Co. v. Carbo*, 410 N.J. Super. 280, 982 A.2d 7 (App. Div. 2009) ................................................................................................................... 10, 16, 17, 20

*Van Gemert v. Boeing Co.*, 590 F.2d 433 (2d Cir. 1978), *aff'd* 444 U.S. 472 (1980) ................. 49

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................... 16, 26, 27

*Watkins v. DineEquity, Inc.*, Civ. No. 11–7182, 2012 WL 3776350 (D.N.J. Aug.29, 2012)....... 9

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) .............................................. 1, 14, 19, 57

*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir. 1975).............................................. 21, 55

*Zimmerman v. Portfolio Recovery Assoc's, LLC*, 276 F.R.D. 174 (S.D.N.Y. 2011) ................. 25

*Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397 (D.N.J. 1990) .................................. 14, 31

**Statutes**

Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332 ........................................................... 50

Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 *et seq.* ........................................................... passim

Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692a, *et seq.*.......................... 25, 40

Federal Supplemental Jurisdiction Statute, 28 U.S.C. § 1367 ......................................... 51, 52, 53

Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* ..................................... 25, 40, 46, 48

Uniform Commercial Code N.J.S.A. 12A:9-615 and 12A:2A-527.............................................. 35

**Rules**

Fed. R. Civ.P. 13 ........................................................................................................................ 48, 49

Fed.R.Civ.P. 23.......................................................................................................................... passim

Fed.R.Civ.P. 30 ................................................................................................................................ 25

**Treatises**

18 Moore's Federal Practice ........................................................................................................... 32

18A Wright, Miller & Kane, Federal Practice and Procedure  (2d ed. 1996) .............................. 33

Newberg on Class Actions  (4th Ed. 2002)............................................................................. 46, 49

## INTRODUCTION AND CLASS DEFINITION

Plaintiff Margaret Korrow brought this action on behalf of herself and tens of thousands of similarly situated New Jersey consumers who entered into rent-to-own (RTO), or lease-ownership, contracts for furniture or other household items with Defendant Aaron's, Inc. (Aaron's).  Korrow alleges that Aaron's contracted for and collected millions of dollars in unlawful and deceptive fees from Class members, who are mostly lower-income consumers.  She specifically alleges that three of the charges Aaron's imposed through its standard-form RTO contracts are prohibited by the Retail Installment Sales Act (RISA), N.J.S.A. 17:16C-1 *et seq.*, and therefore violate the Truth In Consumer Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to 18.  She further alleges that Aaron's' collection of these unlawful and deceptive fees violates the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 *et seq.*  Since Aaron's' violations of New Jersey's consumer protection laws in contracting for these fees and collecting them with the first payments due are evident on the face of its RTO contracts, these claims are readily amenable to class-wide resolution under Fed. R. Civ. P. 23.

Accordingly, Korrow seeks certification pursuant to Rule 23(a) and (b)(3) of the following proposed Class and Sub-Classes:

## THE CLASS

All natural persons who entered into a rent-to-own contract with Defendant Aaron's, Inc. in New Jersey from March 16, 2006 through and including March 31, 2011.[1]

---

[1] The Class start date is the day after the New Jersey Supreme Court held in *Perez v. Rent-A-Center, Inc.*, 186 N.J. 188, 892 A.2d 1255 (2006), that RISA applies to RTO contracts.  *See id.* at 212, 892 A.2d at 1270.  The court later clarified that its holding only applied prospectively for non-parties.  *See Perez v. Rent-A-Center, Inc.*, 188 N.J. 215, 902 A.2d 1232 (2006).  The Class end date reflects that, as set forth *infra* § I.B.1, Aaron's changed the practices addressed herein in April, 2011, in response to this lawsuit.

## CFA-"PRORATED" AMOUNT SUB-CLASS

All members of the Class as defined above who paid Defendant Aaron's, Inc. a first monthly payment that included a "prorated" amount.

## CFA-"SERVICE PLUS" FEE SUB-CLASS

All members of the Class as defined above who paid Defendant Aaron's, Inc. a first monthly payment that included a "Service Plus" fee. [2]

## STATEMENT OF FACTS

Aaron's operates retail stores that offer RTO contracts for consumer electronics, home appliances, and furniture.  Although cast by Aaron's as "lease ownership agreements," its RTO contracts in New Jersey are installment sales contracts, as recognized by the New Jersey Supreme Court in *Perez*, *supra*, 186 N.J. at 212, 892 A.2d at 1270, and by this Court in its order denying Aaron's' motion to dismiss (Dkt. 21-22).  Aaron's' own marketing literature recognizes this: "In the typical transaction, the consumer selects the goods they would like to purchase, and Aaron's arranges financing for the purchase of the goods with monthly payments over a set period of time, after which, the consumer owns the goods."  Declaration of Michael J. Quirk ("Quirk Decl."), <u>Exhibit D</u> (Aaron's brochure titled "Aaron's . . . and an Exciting Future").

---

[2] Although the Complaint identified the proposed Class with less specificity than was possible after discovery, deviation from a class definition proposed in a complaint is permissible where, as here, "[p]laintiffs seek to narrow the class originally proposed and [d]efendants do not articulate any particular prejudice that arises from the newly narrowed class or any additional discovery that would be required." *Casida v. Sears Holdings Corp.*, 2012 U.S. Dist. LEXIS 111599, 30-32 (E.D. Cal. Aug. 8, 2012); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583, 591 (N.D. Cal. 2010), amended in part, 2011 U.S. Dist. LEXIS 84476, 2011 WL 3268649 (N.D. Cal., July 28, 2011).

According to Aaron's, its "typical… customer is an hourly wage job-holder [with] no real estate or financial instruments [and] no savings account or credit cards," *id.*, and its targeted demographic is "lower to middle income consumers." Quirk Decl., Ex. C (Aaron's Form 10-Q filed with U.S. Securities and Exchange Commission for third quarter 2012, p. 19).  According to Aaron's' expert, its rent-to-own customers "are more likely to not own homes, have low incomes, and have a high school education or less," to "lack[] access to credit markets," and therefore to be "less likely to be able to afford to buy durable products outside of the rent-to-own market."  Dkt. 46-15 (Report of Joel Steckel, Ph.D.), ¶ 37.

Ms. Korrow is a lower income consumer who, on July 23, 2009 entered into an RTO contract for a bedroom set at the Aaron's store in Ewing, New Jersey.  *See* Declaration of Henry P. Wolfe ("Wolfe Decl.") (filed under seal), Ex. A ("Consumer Lease Agreement," dated July 23, 2009, produced as AARON'S 000033-000035).  The contract was for an initial term of six months and required Plaintiff to make six monthly payments of $135.64.  *Id.* at AARON'S 000033. The "cash price" for the furniture was identified as $1,827.92.  *Id.*  The contract included what Aaron's called a "Lease Ownership Plan," under which Korrow could make the regular monthly contract payments of $135.64 for 24 months, resulting in a "Total Amount to Acquire Ownership of $3042.48."  *Id.*  The contract also listed an "option to purchase the Leased Property at the end of the Lease Term for $2,064.37."  *Id.*  When added to the total "Monthly Payments for the Lease Term" of $848.88, *id.*, this meant that Korrow could purchase goods with a listed cash price of $1,827.92 over six months at a total cost of $2,913.25.

The monthly payment of $135.64 included a lease payment of $115.25, Sales/Use Tax of $8.87, and an additional "Service Plus Fee" of $11.52, which, according to an "addendum" Aaron's gave Korrow with the other paperwork, was for a variety of services, including a charge to "review and investigate my lease

3

application, to prepare my agreement, or to activate my account." *Id.* at AARON'S 000034.  This means that Korrow incurred a portion of the Service Plus fee when Aaron's prepared the RTO agreement, *i.e.* before she signed it.

The contract also included a provision imposing a $15 "Return Check" charge if a payment check "is returned to Aaron's for any reason." *Id.* at AARON'S 000035.  The contract also required Korrow to pay an additional $35.04 with her initial payment, designated as a "prorated amount," which increased her "First Monthly Payment" to $170.68.  *Id.* at AARON'S 000033.  The $35.04 "prorated amount" is roughly equal to eight days' worth of payments, with daily payments calculated by dividing the full monthly payment of $135.46 by 31 days.  Although Aaron's charged Korrow the $35.04 prorated amount for eight days of rent, the contract did not extend her lease beyond the six-month period. The contract unambiguously identifies the lease term as "six months," beginning on July 23, 2009.  *Id.* at AARON'S 000033.  Nor did the pro-rated amount reduce Korrow's payment obligations in any way.  The contract required her to make five additional monthly payments, none of which was reduced by the prorated amount. *Id.*  Aaron's thus charged and Korrow paid an additional eight days of rent for which the contract gave her nothing in return.

After she signed the contract, Korrow paid Aaron's $240 in cash, which included the $170.68 identified as the total payment due at signing ($135.64 monthly payment plus $35.04 "prorated payment").  Wolfe Decl., Ex. B (AARON'S 000009).  Aaron's subsequently delivered to Korrow's residence bedroom furniture consisting of a bed (including headboard, mattress, box spring, footboard, and metal frame), tall dresser, dresser with mirror and nightstand set. Korrow subsequently made additional payments totaling $144.14, but had to stop paying when her work hours were reduced and she could no longer afford the monthly installments.  Quirk Decl., Ex. A (deposition of Margaret Korrow

4

("Korrow dep.")), at 71:8-10.  All told, Korrow paid Aaron's $384.14, which included $66.82 in fees and charges prohibited by RISA--$31.78 in "Service Plus" fees and the $35.04 "prorated charge."  Wolfe Decl., Ex. B (Aaron's 000009).

After Korrow stopped making payments, Aaron's repossessed the bedroom set.  According to Aaron's' records, the repossession took place on December 11, 2009.  *See* Declaration of Scott Harvey ("Harvey Decl.") (Dkt. 45-2), ¶ 12. Although not relevant to her claims or this motion, Korrow recalls Aaron's repossessing the bedroom set earlier, in late November.  Quirk Decl., Ex. A (Korrow dep.), at 67-68.

## STATEMENT OF PROCEDURAL HISTORY

Legal action between the parties began on December 21, 2009, when Aaron's filed a lawsuit against Korrow in the New Jersey Superior Court, Mercer County, Special Civil Part, Small Claims Section, to collect on the RTO contract for the bedroom set it had already repossessed.  *See* Quirk Decl., Ex. B (small claims complaint in *Aaron's Sales & Lease v. Korrow*, No. SC-1580-09 (N.J. Super. Ct. Law Div.-Special Civ. Pt., Mercer County).  Aaron's sued Korrow for $3,000, alleging that she "failed to uphold terms of lease making only 2.5 of 24 required monthly payments of $135.64.  Also refused to return merchandise."  *Id.*[3]

Aaron's made this claim despite already having collected the bedroom furniture less than five months into the contract.  Harvey Decl., ¶ 12.  Had Korrow paid the $3,000 that Aaron's demanded in its suit, she would have paid a total of $3,374.79, which is nearly double her contract's listed cash price of $1,827.92 and greater than either the "Total Amount to Acquire Ownership" of $3,042.48 or the

---

[3]  None of the employees Aaron's produced for deposition as persons with relevant knowledge could explain the basis for this $3,000 demand amount.  *See* Wolfe Decl., Ex. E (Deposition of Scott Harvey ("Harvey dep.")), at 249:15-250:1; Ex. F (Deposition of Billy Hardison ("Hardison dep.")), at 76:25-78:14; Ex. G (Deposition of David Epright ("Epright dep.")), at 180:7-24.

early purchase option amount of $2,913.25, for goods that she possessed for under five months before Aaron's repossessed them and then sued her.

Aaron's dismissed its complaint after Korrow retained a legal services attorney to represent her in the collection action.  Quirk Decl., Ex. A (Korrow dep.), at 24:10-25:11.

On October 26, 2010, Korrow filed a Class Action Complaint against Aaron's in New Jersey Superior Court, Middlesex County Law Division.  On December 6, 2010, Aaron's removed the case to this Court.  On February 1, 2011, Aaron's filed a motion to dismiss, which Korrow opposed.  On August 25, 2011, the Court (Pisano, J.) filed an order and written opinion denying the motion to dismiss.  Dkt. 21-22.

The parties then engaged in discovery pertaining to class certification. Pursuant to the Court's subsequently-issued scheduling order (Dkt. 50), Aaron's filed a preemptive "Motion to Deny Class Certification" (Dkt. 45) on December 17, 2012.  Korrow now files her accompanying cross-motion for class certification and opposition to Aaron's' preemptive motion.

## SUMMARY OF CLASS CLAIMS

Korrow's and the putative Class's claims arise from Aaron's' practice of contracting for and charging various fees in RTO contracts that RISA does not allow, and therefore prohibits.  N.J.S.A. 17:16C-50 (RISA prohibits all fees not expressly authorized).  Although RISA does not itself provide a private right of action, Korrow seeks remedies for herself and the Class and Sub-Classes for these RISA violations under TCCWNA and the CFA respectively.

TCCWNA prohibits businesses from offering or entering into contracts in consumer transactions that contain provisions that violate any state or federal law. N.J.S.A. 56:12-15.  Under TCCWNA's private action provision, consumers who are offered or made bound by such a contract containing unlawful provisions are

entitled to a minimum of $100 in statutory damages.  N.J.S.A. 56:12-17.  Here, Korrow and every Class member was subject to an Aaron's RTO contract containing one or more provision prohibited by RISA, and thus each is entitled to at least $100 in statutory damages under TCCWNA.

The CFA prohibits businesses from engaging in deceptive or unconscionable commercial practices in sales, N.J.S.A. 56:8-2, including in RTO sales.  *See Perez*, 186 N.J. at 220, 892 A.2d at 1275.  Under the CFA's private action provision, N.J.S.A. 56:8-19, Korrow and all Sub-Class members who paid any portion of the unlawful prorated and Service Plus fees are entitled to treble the amount of these fees that they paid. N.J.S.A. 56:8-19.

In short, these claims involve clear violations of New Jersey consumer protection laws that are evident on the face of form contracts used in tens of thousands of transactions, for which statutorily mandated damages are readily calculable.  This action therefore is ideally suited for class treatment. *See*, *e.g.*, *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) ("An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment.").

## I.    RISA's Prohibition of the Challenged Fees

RISA was enacted to "protect[] the public interest through the regulation of the charges associated with the time sale of goods." *Perez*, 186 N.J. at 209, 892 A.2d at 1268. Among other restrictions, RISA prohibits covered businesses from imposing any fees or charges other than those expressly permitted under RISA:

> No retail seller…  shall charge, contract for, collect or receive from any retail buyer, directly or indirectly, any further or other amount for costs, charges, insurance premiums, examination, appraisal service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other things of value in connection with retail installment contracts or retail charge accounts other than the charges permitted by

this act…

N.J.S.A. 17:16C-50.[4]   Korrow's claims are based on three particular fees and charges contained in Aaron's' standard RTO contracts used during the proposed class period:  (1) a "Service Plus Fee"; (2) a "prorated amount" charge;  and (3) a "Return Check Charge" imposed if a payment check is "returned for any reason."

The "Service Plus Fee" is a monthly fee, ostensibly charged in exchange for a grab bag of "services," including some that are intrinsic to the RTO agreement, such as reviewing, preparing, and investigating the agreement.  These and other services, such as delivery of the goods and a discount on future goods, are not among the types of services for which RISA expressly permits a fee to be charged.

The "prorated amount" amount is a highly deceptive add-on fee for which the contract provides no benefit whatsoever.  The prorated amount does not change the contract's payment due dates, the term of the lease, or any reduction in the amount of monthly payments that must be made.  While the "prorated" designation implies that the charge is for payment between the date the RTO contract is entered into and the regular payment due date (e.g., Korrow's contract date was July 23, 2009, the regular payment due date was the 15th day of each month, and she was charged a "prorated amount" of $35.04, or roughly eight days of payments), the contract does not provide anything in exchange because its express terms state that the end date is an anniversary of the date that the contract is entered into, *not* on a day corresponding with a regular payment due date.  In any event, the "prorated amount" is an additional charge that is not authorized by RISA.  Aaron's' standard

---

[4] An exhaustive list of the fees and charges expressly permitted by RISA includes interest (or "time price differential") (N.J.S.A. 17:16C-41), late fees (§ 42(a)-(c)), attorney's fees, court costs and other expenses incurred in collections (§§ 42(d), 50), certain types of insurance premiums (§§ 30, 33), official fees, such as lien recording fees or motor vehicle license and transfer fees (§§ 1, 27), and a return check fee, but only for checks returned for insufficient funds (§ 42(e)).

"Return Check Charge" violates RISA because it applies when customers' checks are "returned for any reason," whereas RISA specifically permits return check fees only when checks are returned for insufficient funds.  N.J.S.A. 17:16C-42(e).

## II.    Class Claims for RISA Violations Under TCCWNA

TCCWNA is a consumer protection statute enacted to "prevent deceptive practices in consumer contracts by prohibiting the use of illegal terms or warranties in consumer contracts."  *Kent Motor Cars, Inc. v. Reynolds and Reynolds, Co.*, 207 N.J. 428, 457, 25 A.3d 1027, 1044 (N.J. 2011). It provides that:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract…after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller... as established by State or Federal law at the time the offer is made or the consumer contract is signed . . . .

N.J.S.A. 56:12-15.  To effectuate this purpose, TCCWNA provides for a private right of action, entitling the consumers who receive offending contracts to sue for statutory damages of not less than $100, whether or not they suffered actual damages.  N.J.S.A. 56:12-17.  In short, "the NJTCC[WNA] can be violated if a contract…simply contains a provision prohibited by state or federal law, and it provides a remedy even if the plaintiff has not suffered actual damages."  *Watkins v. DineEquity, Inc.*, Civ. No. 11–7182, 2012 WL 3776350, *6 (D.N.J. Aug.29, 2012)(quoting  *McGarvey v. Penske Automotive Group, Inc.*, 639 F. Supp. 2d 450, 458 (D.N.J.2009); *Barrow v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 362 (D.N.J.2006)).

The class claims under TCCWNA here are premised on the provisions in Aaron's standard RTO contract imposing fees that are not specifically authorized by, and therefore prohibited, by RISA.  By offering and entering into contracts

containing these provisions, Aaron's violated TCCWNA as to each consumer who entered into such contracts, and is therefore liable to each of them for TCCWNA's statutory penalty of not less than $100.

The New Jersey courts have already determined that TCCWNA claims arise from contracts containing fees unauthorized by RISA. *United Consumer Financial Services Co. v. Carbo*, 410 N.J. Super. 280, 307, 982 A.2d 7, 23 (App. Div. 2009).[5] In *Carbo*, the Appellate Division addressed claims identical to the "Return Fee Check" claim here. The court first ruled that a return check fee provision in the seller's standard contract violated RISA because it applied not just when a check is returned for insufficient funds, as permitted under N.J.S.A. 17:16C-42, but whenever a check is returned "for any reason." *Carbo*, 410 N.J. Super. at 305, 982 A.2d at 31. Turning then to TCCWNA, the court held that:

> TCCWNA's applicability to the RISA violation at issue here is clear. "[A]ny reasonable person would recognize" that a retail installment sales contract that gives the holder a right to charge a fee not authorized by RISA violates the consumer's "clearly established" right to be free from a contract that permits such a charge.

*Id.* at 307, 982 A.2d at 23 (internal citation omitted). Thus, the court held that the seller violated TCCWNA as to all consumers who entered into a contract containing the return check fee "for any reason" provision, and that it was liable to a class of such consumers for $100 each pursuant to TCCNWA's minimum statutory damage provision, N.J.S.A. 56:12-17. Rejecting the seller's objections that there was no evidence that it ever charged the unlawful fee, the court noted

---

[5] When a federal court interprets state law, "[a]n intermediate appellate state court [decision] ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Houbigant, Inc. v. Federal Ins. Co.*, 374 F.3d 192, 199 n.9 (3d Cir. 2004) (quoting *C.I.R. v. Bosch's Estate,* 387 U.S. 456, 465 (1967)).

that "[i]t is not material that an unauthorized fee for a returned check was neither assessed against nor collected from a member of the class.  N.J.S.A. 17:16C-50 was violated by 'contract[ing] for' the right to assess a check fee not authorized by N.J.S.A. 17:16C-42(e)."  *Id.* at 305, 982 A.2d at 22.  The court also upheld the trial court's certification of the class, noting that the claims were appropriate for class treatment because they involved the same alleged facial violations on the seller's form contracts.  *Id.* at 295, 982 A.2d at 15-16 ("The common nucleus of fact in this class action is the content and form of the contract… prepared by UCFSC and used in each transaction.").

### III.   Sub-Class Claims Under the CFA

The Sub-Class claims under the CFA arise from the "prorated amount" charges and "Service Plus Fees" actually paid by Plaintiff and putative Sub-Class members.  The CFA prohibits "the act, use or employment by any person of any unconscionable commercial practice [or] deception… in connection with the sale or advertisement of any merchandise…"  N.J.S.A. 56:8-2.  As the Court (Pisano, J.) recognized in denying Aaron's' motion to dismiss Korrow's CFA claims, "the Supreme Court of New Jersey held that RISA claims may be asserted under the CFA."  Dkt. 22 at 5, citing *Perez*, *supra*.[6]

The Sub-Class CFA claims are well-suited to class treatment because, as

---

[6]  Even if these fees were not prohibited by RISA, they still would violate the CFA as deceptive and unconscionable commercial practices.  Consumers who pay the "prorated amount" receive nothing in return for it, as it does not extend the lease period covered by the regularly scheduled payment amounts.  The "Service Plus" fee also is deceptive and unconscionable because Aaron's represents it to pay for certain "services," such as "Application Processing," that Aaron's would have to perform with or without this fee, as it must have for those few customers who did not pay the fee but still entered into an RTO contract.  *See* accompanying Declaration of Christopher J. McGinn ("McGinn Decl."), ¶ 12 (43 of 36,016 Aaron's RTO agreements produced did not charge a Service Plus fee).

with the TCCWNA claims, the violations can be determined simply by reviewing form contracts and documents.  With respect to the other elements of a CFA claim, causation and ascertainable loss, Sub-Class members *lost* the money they paid for prohibited fees *as result of* Aaron's charging such fees in its RTO contract. Moreover, the amount of each Sub-Class member's loss can be readily ascertained from their contracts and Aaron's' account records.  *See* Wolfe Decl., <u>Ex. F</u> (Hardison dep.), at 174:12-175:7 ("Q. But we could assess for customers that were in New Jersey at this time how much these customers paid as a service plus fee? A:  Yes.  Underneath service plus.").

## <u>LEGAL ARGUMENT</u>

### I.  The Proposed Class and Sub-Classes Satisfy Rule 23(a)'s Requirements.

The proposed Class and Sub-Classes satisfy all of the applicable perquisites under Rule 23(a) for maintaining a case as a class action.

#### A.  Class and Sub-Class Membership is Readily Ascertainable.

Although it is not among Rule 23(a)'s expressly enumerated requirements, the Third Circuit, this Court and others have held that "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *see also Agostino v. Quest Diagnostics*, 256 F.R.D. 437, 478 (D.N.J. 2009) ("It has long been the case that Rule 23 implicitly requires that prospective plaintiffs propose a class definition that is readily ascertainable based on objective criteria."). The requirement that a class's membership be readily ascertainable facilitates administration of the class action and provision of the best practicable notice to the class, while also protecting the defendant by clearly identifying who is bound by a judgment.

*Marcus*, 687 F.3d at 593. To ensure these objectives, the Third Circuit has found that "[i]f class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." *Id.*

Here, Class and Sub-Class membership is readily ascertainable because it is determined by objective criteria, which is readily identifiable on the face of the Aaron's form RTO contracts.  Class membership is determined by the date of the RTO contract, which is stated in the upper right-hand corner of its first page. *See*, *e.g.*, Wolfe Decl., Ex. A (Korrow RTO contract), at AARON'S 000033 (field for "Agreement Date").  Sub-Class membership is based upon equally objective and readily identifiable criteria, as the only additional requirement is that the Class member have paid an initial "prorated" or "Service Plus" fee as part of her first monthly payments.  The Aaron's RTO contracts itemize both of these charges as part of the first payment due on the date of contracting.  *Id.* (fields for "Monthly Payments"); *see also* Wolfe Decl., Ex. F (Hardison dep.), at 174:12-175:7 (payment of these fees is identifiable in Aaron's' payment records).

Since the Class and Sub-Classes are defined based upon objective criteria that are identifiable on the face of the Aaron's RTO contracts and payment records, their membership is readily ascertainable. *See*, *e.g.*, *Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) ("The class can clearly be ascertained by objective documentation, such as Defendants' employee payroll records and wage statements; no subjective criteria is required to determine the class' contours. The fact that an analysis of Defendants' data is necessary does not render a class unascertainable.") (citations omitted).

**B.    The Class and Sub-Classes Satisfy Rule 23(a)(1)-(4).**

**1.    The Class and Sub-Classes are Sufficiently Numerous.**

Rule 23(a)(1) requires that a proposed class or sub-class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no bright-line threshold, the Third Circuit has found that the existence of "more than 90 geographically dispersed plaintiffs met the numerosity requirement of [Rule] 23(a)(1)." *Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985); *see also Weiss v. York Hosp.*, 745 F.2d 786, 808 (3d Cir. 1984) (affirming finding that class of 92 osteopaths was sufficiently numerous). In assessing numerosity, the court "can make a common sense determination whether it would be difficult or inconvenient to join all class members as named parties under the particular circumstances of a case." *Maldonado v. Houstoun*, 177 F.R.D. 311, 319 (E.D. Pa. 1997). Thus, "[p]recise enumeration of the members of the class is not necessary for the action to proceed as a class action. It is permissible to estimate class size." *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 405 (D.N.J. 1990).

Here, the proposed Class and Sub-Classes are sufficiently numerous. Aaron's admits that it entered into over 50,000 rent-to-own contracts from March 16, 2006 (start of class period) to December 31, 2011 (nine months after end of class period). *See* Wolfe Decl., Ex. E (Harvey dep.), at 174:4-20. Of these, Aaron's produced through discovery electronic "recovered versions of consumer lease agreements that were printed at Aaron's company-operated stores," Quirk Decl., Ex. E (letter of Michael R. McDonald, counsel for Aaron's, explaining documents produced), **36,016** of which were dated March 16, 2006 to October 5, 2009. *See* McGinn Decl., ¶¶ 2-6. For the period starting in October 2009, Aaron's produced an agreed-upon sampling of 93 agreements, 45 of which were entered into during the Class period through March 31, 2011. *Id.*, ¶¶ 18-21. Electronic searches of these documents revealed that:

- 22,524 of the 36,016 contracts (plus 35 of 45 sample contracts), charged a "prorated" amount greater than zero that was included in the amount of the first payment due (*id.* ¶¶ 17, 21);

- 35,973 of the 36,016 contracts (plus 45 of 45 sample contracts) charged a "Service Plus" fee greater than zero due that was included in the amount of the first payment due (*id.* ¶¶ 12, 21); and

- All 36,016 agreements (plus 45 of 45 sample agreements) charged a "Return Check" fee that must be paid if a customer's payment check was returned "for any reason" (*id.* ¶¶ 10, 23).[7]

The foregoing demonstrates that the proposed Class and Sub-Classes consist of at least tens of thousands of New Jersey consumers who paid one or more of these fees, and who cannot practicably be joined in this litigation except through a class action. The proposed Class and Sub-Classes thus are sufficiently numerous.

## 2. The Class and Sub-Classes' Claims Raise Common Questions of Law and Fact.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court recently addressed this requirement, holding that, to satisfy Rule 23(a)(2), a certifiable class-wide claim "must depend upon a common contention," and that "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive

---

[7]  Aaron's eliminated the challenged "prorated" amount and the "for any reason" trigger for its Return Check fee's coverage in early 2011, in response to this litigation.  *See* Wolfe Decl., Ex. E (Harvey dep.), at 203:21-22 ("Well, we made changes post-*Perez*. ***We made changes post-Korrow.***"); *id.* at 204:6-11 (describing "post-Korrow" change to Return Check fee's coverage); *id.* at 35:10-11 ("The prorate was actually charged from October, 2007 to February of 2011 is when it ended . . ."); *see also* McGinn Decl., ¶¶ 22-26 (Return Check fee language changed in April 2011).

the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

In so defining what constitutes a "common question" under Rule 23, the Supreme Court reaffirmed longstanding precedent that distinguishes Rule 23(a)(2) commonality from Rule 23(b)(3) predominance of common questions by recognizing that even one common question (so defined) may demonstrate commonality. *Id.* at 2556 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do . . ."); *see also In re Prudential Ins. Co. of Am. Sales Pract's Litig.*, 148 F.3d 283, 310 (3d Cir. 1998) ("'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'") (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).

"Commonality" under Rule 23(a)(2) thus is not "identicality" of claims. "[F]actual differences among the claims of the putative class members do not defeat certification." *Baby Neal*, 43 F.3d at 56. Instead, "[c]ommonality exists when proposed class members challenge the same conduct of the defendants." *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 446-47 (E.D. Pa. 2000).

Plaintiff's and the Class and Sub-Classes' claims again readily satisfy these requirements. The common nucleus of operative fact for these claims is that Aaron's, through its standard-form RTO contracts, unlawfully contracted for and charged Plaintiff and Class members "prorated" charges, "Service Plus" fees, and/or unlawfully contracted for "Return Check" fees for checks returned "for any reason," that RISA does not authorize and therefore prohibits. *See* N.J.S.A. 17:16C-50 (prohibiting retail installment fees not expressly authorized by RISA); *see also Carbo*, *supra*, 410 N.J. Super. at 305, 982 A.2d at 21 (RISA prohibits contracting for fees or charges other than those permitted by the Act); *id.* at 295-

16

96, 982 A.2d at 15-16 (affirming class certification of claim alleging that RISA prohibited retail seller's return check fee imposed "for any reason" ).

Although any one of the following would suffice to satisfy Rule 23(a)(2), Plaintiff's and Class and Sub-Class members' claims raise one or more of the following commonly answered issues of law or fact:

### Class Claims (Under RISA / TCCWNA)

- Whether Aaron's' standard-form rent-to-own agreements are retail installment sales contracts governed by RISA (*see Perez*, *supra*, 186 N.J. at 212, 892 A.2d at 1270 ("We agree and hold that RISA applies to the rent-to-own contacts at issue here."));

- Whether RISA does not authorize and thereby prohibits Aaron's from contracting to require consumers to pay a "prorated" charge (N.J.S.A. 17:16C-50);

- Whether RISA does not authorize and thereby prohibits Aaron's from contracting to require consumers to pay a "Service Plus" fee (N.J.S.A. 17:16C-50);

- Whether RISA does not authorize and thereby prohibits Aaron's from contracting to require consumers to pay a "Return Check" fee if a check is returned "for any reason" (N.J.S.A. 17:16C-42(e),50; *see also Carbo*, 410 N.J. Super. at 305-06, 982 A.2d at 22 ("The [return check] charge specified in this contract, which can be charged 'for any reason,' violates N.J.S.A. 17:16C-50 because it is not authorized by N.J.S.A. 17:16C-42(e) or any other provision of RISA."));

- Whether any or all of the foregoing contracted-for charges that RISA prohibits thus also violate TCCWNA because they violate a "clearly established legal right" of consumers (N.J.S.A. 56:12-15; *Carbo*, 410 N.J. Super. at 307, 982 A.2d at 23 ("TCCWNA's applicability to the RISA violation at issue here is clear.")); and

- Whether any or all of these TCCWNA violations entitle Plaintiff and Class members to monetary relief and reasonable attorney's fees and costs provided under the Act (N.J.S.A. 56:12-17).

### CFA-"Prorated" Amount Sub-Class Claim

- Whether Aaron's collection of a "prorated" charge, which RISA prohibits, without either extending the contract's term, changing the contract's payment schedule, or reducing the payments owed, is a deceptive and unconscionable commercial practice under the CFA (N.J.S.A. 56:8-2); and

- Whether Plaintiff's and Sub-Class members' payment of the prohibited and deceptive "prorated" charge for which the contract provides nothing in return constitutes an ascertainable loss under the CFA (N.J.S.A. 56:8-19).

### CFA-"Service Plus" Fee Sub-Class Claim

- Whether Aaron's collection of monthly "Service Plus" fees, purportedly for items such as "Application Processing," delivery, relocation, payment holiday, discounts on new agreements, and other purported benefits for which RISA does not authorize and thereby prohibits separate charges in retail installment contracts, is an unconscionable commercial practice under the CFA (N.J.S.A. 56:8-2; *see also Perez*, *supra*, 186 N.J. at 220, 892 A.2d at 1275 (reinstating CFA claim based upon reinstated claim that rent-to-own contract's interest charges violated RISA));

- Whether Plaintiff's and Sub-Class members' payment of the unlawful and unconscionable "Service Plus" fees to Aaron's constitutes an ascertainable loss under the CFA (N.J.S.A. 56:8-19).

These common questions of law and/or fact have common Class-wide or Sub-Class-wide answers that will determine or drive the resolution of Plaintiff's and Class and Sub-Class members' claims, and therefore readily satisfy Rule 23(a)(2)'s requirements.

**3.    Plaintiff's Claims are Typical of the Class and Sub-Classes.**

Rule 23(a)(3) requires that the claims or defenses of the class representative be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). The "typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re Prudential*, 148 F.3d at 311 (citations omitted). Thus, "[t]o evaluate typicality, we ask whether the named plaintiff's claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006) (citations omitted).  Rule 23(a)(3) is satisfied where a named plaintiff can "show that the issues of law or fact he or she shares in common with the class occupy the same degree of centrality to his or her claims as to those of unnamed class members."  *Weiss v. York Hosp.*, 745 F.2d at 809 n.36 (citation omitted).  Thus, "factual variations will not defeat certification where the various claims arise from the same legal theory," unless there is a danger with respect to the named plaintiff that "the unique circumstances or legal theory will receive inordinate emphasis" so that the common claims "will not be pressed with equal vigor or will go unrepresented."  *Id.*

Here, Korrow is a typical victim of Aaron's' unlawful practices. She entered into a rent-to-own contract with Aaron's that provides for an installment purchase of consumer goods, and contains provisions requiring payment of (1) a "prorated amount" with the first monthly payment, (2) a "Service Plus Fee" paid with the first monthly payment, and (3) a "Return Check" charged if one of her payment checks is returned "for any reason."  *See* Wolfe Decl., Ex. A (Korrow contract). Korrow contends and her claims for relief depend upon the contention that her rent-to-own contract is a retail installment contract governed by RISA, that RISA does not authorize and thereby prohibits contracting for any of these charges, and that she is therefore entitled to appropriate monetary and equitable relief under

TCCWNA for these unlawful contract obligations.  *See* Class Action Complaint (Complaint) (Dkt. 1, Ex. A), ¶¶ 103-05, 113-14, 129-35. Class members assert the same claims for relief based upon Aaron's' imposition of the same unlawful contractual provisions in their rent-to-own contracts.  The Court's determinations as to the lawfulness of these common contract provisions under RISA and TCCWNA will determine Korrow's and Class members' entitlement to relief under these statutes.  *See, e.g.*, *Carbo*, *supra*, 410 N.J. Super. at 305-07, 982 A.2d at 21-23 (affirming summary judgment for plaintiff and certified consumer class on claims that retail installment contract's "return check" fee imposed "for any reason" was prohibited by RISA and thus violated and afforded remedies under TCCWNA whether or not a consumer paid the fee).  Korrow's RISA-based TCCWNA claims thus are typical of the Class's claims.

Korrow also is typical of the CFA Sub-Classes she seeks to represent.  She alleges that Aaron's' "prorated" charge that RISA prohibits also violates the CFA because the contract requires her to pay this amount but does not provide her with any benefit in exchange for this payment.  Complaint, ¶¶ 112-16.  The one substantive difference between this and her TCCWNA claim is that she alleges that her ascertainable loss under the CFA (N.J.S.A. 56:8-19) is her payment of the "prorated" charge to Aaron's. Complaint, ¶ 116.  Since the proposed CFA-"Prorated" Amount Sub-Class consists of Class members who likewise paid a prorated fee to Aaron's, Korrow is typical of this Sub-Class.

The same is true with respect to the CFA-"Service Plus" Fee Sub-Class, where again Korrow alleges that Aaron's' Service Plus fees are prohibited by RISA and therefore violate the CFA, *id.* ¶¶ 102-05, and that her ascertainable loss is her payments of this fee as part of her monthly payment amount. *Id.* ¶ 111. Since Korrow was contractually obligated to and did pay these prohibited fees, she is

typical of the proposed CFA Sub-Classes consisting of Class members who likewise paid one or both of these prohibited fees.

In sum, since Korrow's TCCWNA and CFA claims are based on the same unlawful rent-to-own contract provisions as are Class and Sub-Class members' claims and require her to make the same factual showing to obtain relief, she is typical of the Class and Sub-Classes that she seeks to represent.

### 4.    Plaintiff and Counsel Will Adequately Represent the Class and Sub-Classes.

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). "Adequate [class] representation depends on two factors:  (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."  *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). In determining the adequacy of class representation under Rule 23(a)(4), "[t]he burden is on the defendant to demonstrate that the representation will be inadequate."  *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982).

Here, Plaintiff and counsel alike are adequate to represent the Class and Sub-Classes.  As shown with respect to typicality, Korrow is an adequate Class and Sub-Class representative because she does not have antagonistic interests inasmuch as her claims for relief are predicated upon the same legal and factual allegations. *See*, *e.g.*, *Wetzel*, 508 F.2d at 247-48 ("The interests of Wetzel and Ross in combatting the sexually discriminatory policies of the Company surely are coextensive with all female technical employees, whether formerly or presently employed. . . . The relief to be granted by the district court . . . will benefit all members of the class. We see no other factors revealing that the plaintiffs were not

adequate representatives of the class."). Likewise, Korrow's undersigned counsel are highly experienced in consumer class actions and other complex litigation—including RISA, TCCWNA, and CFA cases—and thus are able to effectively prosecute hers and the Class and Sub-Classes' claims. *See* Quirk Decl., Ex's F-H and McGinn Decl., ¶¶ 32-38 (law firm resumes and qualifications). Plaintiff and counsel thus satisfy the requirements of Rule 23(a)(4) for adequate representation of the proposed Class and Sub-Classes.

### C.   Aaron's' Arguments for Denial of Class Certification Based Upon Rule 23(a) Fail.

In its brief in support of its preemptive motion to deny class certification (Dkt. 45 and 45-1), Aaron's raises a host of meritless arguments based on alleged failure to satisfy Rule 23(a). Aaron's' Rule 23(a) arguments rely upon non-existent or non-applicable legal standards coupled with distorted, one-sided depictions of the factual record. Each of these arguments is taken in turn.

#### 1.   Ascertainability

Aaron's contends that there is no ascertainable class that can be certified because of asserted issues pertaining to its periodic amendments of its rent-to-own contracts, the residency of Class members, and whether Class members entered into their contracts for consumer or commercial purposes. *See* Aaron's Brief at 35-36. Korrow's cross-motion either moots or rebuts these arguments.

First, Aaron's contends that, because it "changes its agreement from time to time," it is "not possible to ascertain what agreements are 'the same' or which agreements are 'similar'" to Korrow's agreement without examining each customer's agreement. Aaron's Brief at 35. These references to agreements that are "the same" as or "similar" to Korrow's refer to the Complaint's class

definition.  *See* Complaint, ¶ 86.  In her Cross-Motion, Korrow specifies the operative five-year time period that the proposed Class covers and explains the correspondence between this period and Aaron's' imposition of the fee provisions that she challenges in its New Jersey RTO contracts.  *See supra* pp. 1-2 (Class and Sub-Class definitions based on specified five-year time period) and Argument § I.B.1 and McGinn Decl. ¶¶ 2-26 (explaining correlation of time period to Aaron's' use of the challenged provisions in Korrow's contract).  By defining the proposed Class for this specified time period, Korrow has ensured that every covered Class member has one or more of the challenged RTO contract fee provisions—*i.e.* those requiring payment of any or all of the following:  (a) a "prorated" due with the first payment; (b) a "Service Plus" fee due with the first payment; or (c) a "Return Check" fee or charge that must be paid if the person's check is returned "for any reason."  Thus, both Class membership and the occurrence of one or more of these claims are readily determinable on the face of each contract, so that whether Aaron's amended its form rent-to-own contract over time is irrelevant.

Aaron's seems to recognize this, as its bottom-line argument is that class membership is not ascertainable "without examining each customer's agreement."  Brief at 35.  But Aaron's keeps all of its contracts in secured locations in its New Jersey stores, making them readily accessible when Aaron's management needs to review them.  *See* Wolfe Decl., Ex. G (Epright dep.), at 183:24-185:15 ("[T]hey're kept on premises under lock and key and fireproof storage . . .").  Indeed, Aaron's produced tens of thousands of electronic unsigned versions of these agreements through discovery.  *See* McGinn Decl., ¶¶ 2-6.  Thus, all that is needed to ascertain Class membership is a search of these company records.  *Cf. Flores*, *supra*, 284 F.R.D. at 123 ("The class can clearly be ascertained by objective documentation, such as Defendants' employee payroll records and wage statements; no subjective criteria is required to determine the class' contours.  The fact that an analysis of

Defendants' data is necessary does not render a class unascertainable.") (citations omitted).  Aaron's' argument against finding that the Class's membership is ascertainable thus fails and should be rejected.

Aaron's next argues that the Complaint's class definition failed because it was not limited to New Jersey residents covered by the State consumer protection statutes at issue. *See* Aaron's Brief at 35 (citing Complaint, ¶ 86). Here again, Korrow clarifies herein that she seeks to certify a Class of persons who "entered into a rent-to-own contract with Defendant Aaron's, Inc. ***in New Jersey*** . . ." *Supra* at 1 (emphasis added).  This limitation based upon the conducting of the rent-to-own transaction at a New Jersey store is appropriate for application of New Jersey's consumer protection statutes.  *See*, *e.g.*, *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 546-48 (D.N.J. 1998) (applying Consumer Fraud Act to transaction between New Jersey seller and Pennsylvania buyer).  Moreover, even if New Jersey residency were required for Class membership, this too is readily determinable on the face of the Aaron's RTO contracts, which (not surprisingly) have fields for the buyer's name, address, and telephone number.  *See* Wolfe Decl., Ex. A (Korrow contract), at AARON'S 000033 (field for "Customer Name" and "Address").  Aaron's' argument based on Class member residency thus likewise fails and should be rejected.

Aaron's' final argument on ascertainability, that Class membership cannot be ascertained for purposes of the TCCWNA claims without first determining whether a contract was entered into for consumer or commercial purposes (Aaron's Brief at 36), likewise is legally and factually deficient.  Plaintiff addressed this concern by specifying that the Class is limited to "natural persons," but Aaron's claims this is not enough.  Aaron's is wrong.  That TCCWNA applies only to "consumer contract[s]," defined as those entered into "primarily for personal, family or household purposes," N.J.S.A. 56:12-15, is hardly unusual.  Numerous

federal and state consumer protection statutes so define their coverage of "consumer" transactions, and courts long have held that this is not a bar to class certification. *See, e.g., Zimmerman v. Portfolio Recovery Assoc's, LLC*, 276 F.R.D. 174, 180 (S.D.N.Y. 2011) (addressing Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e); *Perry v. Beneficial Fin. Co. of N.Y., Inc.*, 81 F.R.D. 490, 496 (W.D.N.Y. 1979) (addressing Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*). In *Perry*, the court found that the issue of whether a loan was a "consumer loan" covered by TILA did not preclude class certification because that case, *like this one*, was:

> brought by a plaintiff who obtained a consumer loan for the purchase of household furniture. Moreover, defendant is a lender who loans money at interest rates substantially higher than those offered by area banks and to lenders [*sic*] who often cannot obtain credit elsewhere. Thus, there is the substantial likelihood that most of the loans herein were for consumer purposes. While I do not question defendant's bare assertion that 'a number of the loans to the proposed class were in all likelihood for commercial purposes,' commonality is preserved by limiting the definition of the class to those persons who obtained consumer loans. In addition, this court can require class members to supply documentation of the nature of their loans as a condition to sharing in any class recovery.

*Perry*, 81 F.R.D. at 496; *cf. Zimmerman*, 276 F.R.D. at 180 ("[A]ny disputes regarding whether a particular class member's debt is consumer or commercial can be remedied through proper drafting of the claim form, and at the damages phase of the case.").

Here, it is substantially, if not overwhelmingly, likely that Aaron's' RTO contracts are consumer contracts.  Aaron's' Rule 30(b)(6) designee, Scott Harvey, admitted that corporate customers buy from Aaron's only "from time to time," and are identifiable by having an entity's name rather than a person's name.  *See* Wolfe Decl., Ex. E (Harvey dep.), at 179:17-180:7.  Aaron's' hired expert also readily

25

admits that the Aaron's customer base, like that in *Perry*, typically "lacks access to credit markets and is therefore less likely to be able to afford to buy durable products outside of the rent-to-own market."  *See* Dkt. 46-15 (Report of Joel Steckel, Ph.D.), ¶ 37.

The conclusion that Aaron's RTO customers are overwhelmingly persons buying for personal use is further borne out by the agreements Aaron's produced through discovery.  An electronic search of the "Customer Name" field of these 36,016 Class period agreements reveals that names containing any of the words "**company**," "**LLC**," "**corp.**," "**inc.**," "**Ltd.**," "**church**," "**association**," or "**associates**," which would suggest a business or non-consumer purpose, turned up **zero (0)** times.  McGinn Decl., ¶¶ 27-28.  A further review of 442 agreements randomly selected from throughout the part of the Class period covered by Aaron's' document production confirmed that, of these 442 agreements, only **one (1)** (0.23%) was entered into by a customer whose name was not that of a natural person.  *Id.* ¶¶ 29-31.  Although this does not prove that *every* Aaron's customer had a consumer purpose, the virtual absence of business customers shows that this is at most a marginal issue that does not undermine the Class's ascertainability.

### 2.   Commonality

Although Aaron's wisely does not dispute that the proposed Class is sufficiently numerous, it does challenge commonality on the grounds that the Supreme Court's recent *Wal-Mart v. Dukes* decision  "heightened the standards for establishing commonality under Rule 23(a)(2)" (Brief at 32 (quoting *M.D. ex re. Stukenberg v. Perry*, 675 F.3d 832, 839-40 (5th Cir. 2012)), and that these standards purportedly cannot be satisfied because of changes Aaron's made to its

contract during the Class period and because of asserted defenses to Class members' claims (Brief at 33-34). These arguments fail.

The Court need not decide whether *Dukes* creates a new or "heightened" standard for commonality. *Cf. Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 345 (3d Cir. 2011) (*en banc*) (Jordan, J. dissenting) ("*Dukes's* instruction that, for questions to be "common" in the sense contemplated by Rule 23, their answers must affect the validity of claims, does not set forth a new principle."). For the reasons set forth herein (*supra*, Argument § I.B.2), Korrow's RISA-based TCCWNA and CFA claims readily satisfy *Dukes'* requirement that one or more common claims "generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. The Court's determination of whether each of the rent-to-own contract fees that Korrow challenges is prohibited by RISA and thus violates TCCWNA and/or the CFA will provide Class-wide and Sub-Class-wide answers that will determine each member's entitlement to relief under these statutes. The fact that Aaron's may have amended its rent-to-own contracts during the Class period again is immaterial because the Class and Sub-Classes are defined for a period when every Aaron's RTO contract in New Jersey had one or more of the allegedly violative provisions.

Likewise, Aaron's' argument that its asserted "defenses" to certain Class members' claims "will depend upon unique facts on their accounts with Aaron's" (Brief at 33-34) fails because it does not identify any defenses to *liability* for violation of the consumer protection statutes at issue, and any purported defenses to damages or other relief do not destroy commonality where (as here) Class members allege the same statutory violations based on the same conduct by Aaron's. *See*, *e.g.*, *Baby Neal*, *supra*, 43 F.3d at 57 (finding commonality where "individual damage determinations could be made . . . at a separate phase of the trial, but the class phase could resolve the central issue of liability for the alleged

misrepresentations and omissions.").  Aaron's' arguments against finding commonality thus likewise fail and should be rejected.

### 3.   Typicality and Adequacy of Representation

The crux of Aaron's' arguments for denying class certification under Rule 23(a) is that Ms. Korrow purportedly is not an adequate representative because she lacks sufficient knowledge of the Class's claims (Aaron's Brief at 13-26), and is not typical of the Class because of purportedly unique defenses to her claims (*id.* at 27-32).  Aaron's' arguments on these matters distort both the governing law and the facts of record, and thus again fail and should be rejected.

First, with respect to Korrow's adequacy and knowledge of the Class's claims, Aaron's' both overstates what governing Circuit law requires and understates Korrow's actual knowledge.  The Third Circuit long has held that the "adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel."  *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982); *see also New Directions Treatment Serv's v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("Rule 23(a)(4)'s requirement that a class representative fairly and adequately protect the interests of the class mainly seeks to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.") (citations omitted).  Here, Korrow readily satisfies these standards, as she has no conflicting interests since hers and the Class's and Sub-Classes' claims are based on the same statutory liability theories applied to the same conduct by Aaron's.

Moreover, Ms. Korrow's deposition testimony (Quirk Decl., <u>Ex. A</u>) demonstrates that she (1) has a basic understanding of these claims as an ordinary consumer who entered a transaction that Aaron's admits is aimed at lower-income, less educated persons (Steckel Report-Dkt. 46-15, ¶ 37); (2) has performed her duties as putative Class representative; and (3) has been harmed by Aaron's' conduct that she challenges on behalf of the putative Class and Sub-Classes:

- Case is "mainly about the fees, retail fees and prorate fees." (p.35:3-4);

- She sued Aaron's "[b]ecause I believe that they're fraudulent. That they . . . take people's money with hidden fees." (p.49:4-8);

**<u>Representation of Class</u>**

- Q:  "How much time do you intend to spend on this litigation going forward?"

  A:  "As much time as it takes."  (p.72:21-24);

- Q:  "How much time personally have you spent on the litigation?  . . . More than twenty-four hours?

  A:  "I believe so." (p.73:10-19);

- Q:  regarding Complaint ¶ 86, "Do you understand that that's what you're doing, you're seeking a certification of that class?"

  A: "Yes." (p. 263:8-22);

- Q: "Do you remember providing any information to your attorneys?"

  A: "Yeah." (p. 291:1-3);

- Q: "Do you understand that by filing this case you're seeking relief, you're seeking to get some money from Aaron's not just for yourself but for all of their customers?"

29

A: "Yes."  (p. 321:1-5).

## "Prorated" Fee Claim

- Q: "[D]o you think there's anything wrong with that?

  A:  "I guess not if the fact is that you're not paying anything up front until you get the furniture. But I paid up front every single time before I got anything." (p.186:9-14);

- Q: "But did you suffer any financial injury as a result of paying a prorated amount?"

  A:  "I believe I did because if I paid that amount it was my initial payment, that means that you charged me more than what my initial payment was supposed to be. So, therefore, if I paid it out of my pocket, yes, it's an injury." (p.216:2-9);

## "Return Check" Fee Claim

- "That I may have a problem with. Because the bank already charges you a fee - -  - - if you have a return check. So I think that would be an inappropriate charge."  (p. 189:9-20);

## "Service Plus" Fee Claim and Facts

- Q:  "Did you understand at the time you signed this that you were paying a service plus fee?"

  A:  "No." (p. 196:12-15);

- Q: "Did you ever exercise a payment holiday in connection with this agreement?"

  A: "I have no clue what that means."

  Q:  "Would you like to read it?"

  A: "I can barely make out what it says." (p. 197:18-24);

- Q: "Were you aware that there's a damage waiver provision before you signed this agreement?"

  A: "No." (pp. 198:24-199:2);

30

- Q: "Limited warranty, same thing?"
  A: "No." (p.200:8-9);
- Q: "Lifetime reinstatement plan?"
  A: "No." (p.200:10-12);
- Q: "Did you ever become aware of any of these provisions?"
  A: "No." (p.200:16-18).

*See* Quirk Decl., <u>Ex. A</u> (Korrow dep., transcript excerpt pages noted above).

The foregoing demonstrates that Ms. Korrow is a more-than adequate Class representative.  Aaron's' argument that she must show greater knowledge to be able to direct the litigation has been rejected time and again in this Circuit. *See*, *e.g.*, *Lewis*, *supra*, 671 F.2d at 789 ("The directors argue that plaintiff shareholder cannot fairly and adequately represent the interests of the other shareholders unless he has knowledge of the material facts in support of his claim. There are certainly cases that support such a requirement. We do not believe, however, that such a requirement makes vigorous representation of the class any more likely."); *New Directions*, *supra*, 490 F.3d at 313 ("A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.") (citation omitted); *Summerfield v. Equifax Info. Serv's, LLC*, 264 F.R.D. 133, 141 (D.N.J. 2009) ("A class representative's lack of knowledge about his case does not render him an inadequate representative."); *Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287, 295 (D.N.J. 2007) ("A proposed representative's lack of particularized knowledge concerning the dispute at issue does not render her inadequate given the fact that she has retained adequate counsel to represent her.") (citation omitted); *Szczubelek v. Cendant Mortg. Corp.*, 215 F.R.D. 107, 119-20 (D.N.J. 2003) (same); *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 408 (D.N.J. 1990) ("Contrary to defendants' assertion, there is no requirement pursuant to Rule 23

that the named plaintiff must be totally aware of all the facts concerning the claims at issue."). Ms. Korrow will adequately represent the Class.

Aaron's' challenges to Korrow's and her undersigned counsel's adequacy based on alleged "claim-splitting" (Aaron's Brief at 26-27) also are meritless. First, Aaron's baselessly alleges that "Ms. Korrow learned that certain claims relating to usurious interest or time-price differential had been withdrawn upon speaking with her attorney at the deposition." Aaron's Brief at 27. In fact, Korrow testified that she knew about the withdrawal of this claim, that counsel had discussed this with her, and that she had had two to three in-person meetings and at least five to ten telephone discussions with counsel prior to her deposition, during which time she had moved to Florida. *See* Quirk Decl., Ex. A (Korrow Dep.), at 296:13-297:5 (awareness and discussion of claim withdrawal); 28:18-31:18 (meetings with counsel); 31:19-33:16 (telephone discussions with counsel); 14:6-18 and 62:2-22 (move to Florida after case was filed).

Second, Aaron's' argument that the decision not to pursue the usury claim through class certification is impermissible "claim splitting" that creates a *res judicata* risk (Aaron's Brief at 26) is equally baseless. A class action "'is one of the recognized exceptions to the rule against claim-splitting.'" *Gunnells v. Healthplan Serv's, Inc.*, 348 F.3d 417, 431-32 (4th Cir. 2003) (quoting 18 Moore's Federal Practice § 131.40[3][e][iii] (2002)) (internal citation omitted); *see generally* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). The U.S. Court of Appeals for the Sixth Circuit recently addressed this exception in affirming class certification of claims for declaratory relief that left open later individual damages actions, explaining that "[p]iecemeal certification of a declaratory-relief only class does not present a problem of preclusion for class members who wish to pursue damages claims" because, "'[p]ursuant to the same general principal that claim preclusion

does not apply to matters that could not be advanced in a prior action, individual actions remain available to pursue any other questions that were expressly excluded from the class action.'"  *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428 n.2 (6th Cir. 2012) (quoting 18A Wright, Miller & Kane, Federal Practice and Procedure § 4455 (2d ed. 1996)).  Since Plaintiff excluded this separate claim addressing the amount of interest charged from the class action, a Class member's pursuit of this claim in a separate action would not be barred by *res judicata*.  Aaron's' "claim splitting" argument thus fails and should be rejected.

Finally, Aaron's' challenge to Korrow's adequacy and typicality based on its assertion of counterclaims and defenses against her and Class members (*see* Aaron's Brief at 23-25, 28-32) likewise fails.  Plaintiff addresses the effect of Aaron's' asserted counterclaims and defenses with respect to the Class as a whole more fully below in the discussion of satisfaction of Rule 23(b)(3) (*infra* § II.C).  For purposes of her typicality and adequacy, the counterclaims and defenses Aaron's asserts go to her performance under the contract and amounts she allegedly owes it that might offset her recovery of statutory relief.  *See* Aaron's Brief at 28-29.  Since these *are not* defenses to liability under the consumer protection statutes underpinning Korrow's claims challenging the same practices that the Class and Sub-Classes challenge, they do not create individualized liability issues that would render her atypical or inadequate. *See Baby Neal*, *supra*, 43 F.3d at 58 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.").

In *Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008), the court rejected arguments almost identical to those Aaron's makes here based on alleged counterclaims and defenses within a class in finding named plaintiffs typical and adequate to represent a class asserting similar claims challenging facially unlawful

fees.  There, as here, the defendants asserted that "there is a conflict between health club members who defaulted on their contracts and members who did not," and that "***certification of the proposed Class will expose members who defaulted on their contracts to counterclaims for the unpaid balances.***"  *Id.* at 182-83 (emphasis added). The court squarely rejected this argument, finding that "hypothetical counterclaims do not impact class certification, particularly where the record provides no basis for finding that such counterclaims would create difficulties that outbalance the advantages of class treatment."  *Id.* at 183. The court explained that it:

> is not persuaded by the defensive 'sabre-rattling' that such counterclaims, even if they in fact exist, cause a conflict between class members. ***In some ways, defaulted class members have an even greater interest in the lawsuit than non-defaulted members because they have more to gain. A person who is in default may well want to void his or her contract or, if appropriate, cure the default by off-setting any monetary damages.***

*Id.* (emphasis added). The court thus found that a named plaintiff who was alleged to be in default would adequately represent the class.  *Id.*  This Court should reach the same conclusion and reject the same arguments that Aaron's makes here.

Even if Korrow's alleged indebtedness were relevant, she still would be an adequate Class representative because all of the statutory violations she alleges are defenses to Aaron's' counterclaim and more than offset its asserted value.  Aaron's claims that Korrow owes it $439.71 for amounts unpaid for her six-month lease period.  *See* Harvey Decl. (Dkt. 45-2), ¶¶ 9-10.  This is an effective admission that Aaron's violated the CFA by suing her for $3,000 ***on the same account*** after it repossessed the goods in December 2009, which action it dismissed only after she

retained a Legal Services attorney.[8]  Aaron's thus misrepresented and improperly imposed a debt against Korrow that was $2,560.29 in excess of what it *now* says she owed, causing her an ascertainable loss for which the CFA entitles her to treble damages.  *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454, 464 (1994) (imposition of improper debt may constitute ascertainable loss under CFA). The counterclaim is further offset by Korrow's claims as a Class and Sub-Class member, including her TCCWNA statutory damages claim of at least $100 (N.J.S.A. 56:12-17), and CFA claim for treble the unlawful fees she paid, totaling $200.46 (N.J.S.A. 56:8-19).  Finally, Aaron's' alleged damages are diminished because they were mitigated when it repossessed the goods from Korrow and almost immediately re-leased them to other customers within the claimed six-month lease period.  *See* Wolfe Decl., Ex. D (Aaron's 307345-307352) (re-lease dates in December 2009-January 2010); *see also* N.J.S.A. 12A:9-615 and 12A:2A-527(2) (consumer is entitled to credit when property is resold or released after repossession).  In short, Korrow's alleged debt does not exist and, even if it did, would be irrelevant to her demonstrated adequacy to represent the Class.

In sum, Plaintiff and the proposed Class and Sub-Classes readily satisfy the prerequisites of Rule 23(a). The arguments to the contrary that Aaron's raised in its preemptive motion distort both the governing law and the facts of record before the Court. For all of the reasons set forth herein, the Court should hold that Plaintiff has satisfied all of the express and implicit requirements of Rule 23(a) for class action certification.

---

[8] Aaron's falsely suggests that the higher amount sought in the small claims case was justified because the goods "had not been returned" at that time.  Harvey Decl. (Dkt. 45-2), ¶11-12. However, the small claims case was filed on December 21, 2009 (*see* Quirk Decl., Ex. B, p.2), which was ten days *after* the date when Aaron's says it repossessed the goods, December 11, 2009.  Harvey Decl. (Dkt. 45-2), ¶11.

## II.   The Class and Sub-Classes Satisfy All Requirements of Rule 23(b)(3).

### A.   The Common Issues of Law and Fact Predominate as to All of Plaintiff's and the Class's and Sub-Classes' Claims.

The predominance inquiry examines "whether the proposed class is sufficiently cohesive to warrant adjudication by representation."  *In Re Community Bank of No. Va.*, 418 F.3d 277, 307-308 (3d Cir.2005) (citing *Amchem Prod's, Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997)).  The "presence of individual questions ... does not mean that the common questions of law and fact do not predominate." *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir. 1985). Here, common issues clearly predominate, both as to the Class Claims under TCCWNA and the Sub-Classes claims under the CFA.

### 1.   Common Questions Predominate With Respect to the Class Claims Under TCCWNA.

The proposed Class consists of tens of thousands of New Jersey consumers whose RTO contracts with Aaron's required payment of one or more of the "prorated" amount, "Service Plus" fee, or "Return Check" charge for checks returned "for any reason" that RISA and thus TCCWNA prohibit.  The lawfulness of each of these provisions, which are easily identified on the face of the standard-form RTO contracts, is a predominating question common to the Class.  *See*, *e.g.*, *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) ("An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment."); *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) ("[C]laims arising from

36

interpretations of a form contract appear to present the classic case for treatment as a class action"). Whether each fee provision violates RISA and thus TCCWNA are questions of law that, once decided, will apply to all Class members.

Moreover, because TCCWNA provides minimum statutory damages of $100 without requiring harm, there is no need for individualized determinations of causation, or for damages calculations with respect to the smaller value prorated amount or Return Check fee claims. For the Service Plus fee claim, where required monthly payments of the fee may have exceeded $100, a Class member's damages in the amount paid still is readily determinable from Aaron's' payment records. *See* Wolfe Decl., Ex. F (Hardison dep.), at 174:12-14. Thus, appropriate relief for these claims is readily determinable.

Since Class membership is defined by a contract's inclusion of one or more of the challenged fee provisions alleged to violate RISA and TCCWNA, the determination of Class membership plus the Court's rulings on the alleged RISA and TCCWNA violations will determine every Class member's right to TCCWNA relief. *See Barrows v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 362 (D.N.J. 2006) (TCCWNA is "violated if a contract or notice simply contains a provision prohibited by state or federal law, and it provides a remedy even if a plaintiff has not suffered any actual damages."). In short, it is difficult to imagine a claim in which common questions predominate over individual ones to a greater extent than the Class TCCWNA claims here.

### 2.   Common Questions Predominate With Respect to the Sub-Class Claims Under the CFA.

The CFA Sub-Class claims are based on Class members' payments of the unlawful prorated and Service Plus Fees, which ranged from under $10 for the one-time prorated charge to perhaps several hundred dollars in monthly Service

Plus fees paid over the full duration of an RTO contract.  These claims cannot practicably be vindicated outside of a class action.  *See*, *e.g.*, *Lee v. Carter-Reed Co., LLC*, 203 N.J. 496, 517-18, 4 A.3d 561, 574 (2010) ("A class action permits [consumer fraud] claimants to band together and, in doing so, gives them a measure of equality against a corporate adversary, thus providing a procedure to remedy a wrong that might otherwise go unredressed.") (citations omitted).

The CFA Sub-Class claims are susceptible to common proofs on all elements and easily satisfy the predominance requirement.  A CFA claim has "three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13, 842 A.2d 174, 176 (App.Div. 2003).  As to "unlawful conduct," Korrow alleges that, by charging class members "Service Plus" fees and "prorated" charges prohibited by RISA, Aaron's engaged in deceptive and unconscionable commercial practices in violation of the CFA at N.J.S.A. 56:8-2.  See *Perez*, 186 N.J. at 220, 892 A.2d 1275 (reinstating CFA claim based upon overcharges in violation of RISA).  If these allegations succeed or fail for one Class member who was charged these fees, they succeed or fail for all Class members.  As with the TCCWNA claims, this analysis involves a review of standard documents and practices, and an application of the law to them.

As to ascertainable loss, the unlawful fees Aaron's charged that Korrow and Sub-Class members paid constitute an ascertainable loss under the CFA.  *See*, *e.g.*, *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 559, 964 A.2d 741, 751 (2009) ("[T]he overcharge in question is one that can be readily quantified and thus is ascertainable within the meaning of the CFA.").

As to loss-causation, Korrow and Sub-Class members would not have paid these fees if Aaron's had not charged them.  Thus, Korrow and Sub-Class members

paid money for these fees *as a result of* Aaron's unlawful practice of charging them.  Again, since the CFA Sub-Class members are defined as customers who actually paid a "Service Plus" fee or a "prorated amount" – a characteristic readily determined from Aaron's records – the determination of Sub-Class membership effectively determines both the presence of an ascertainable loss and its causation.

The amount of damages to which each CFA Sub-Class is entitled can be readily calculated from Defendant's records by simply trebling the amounts paid for the unlawful fees and charges.    While this phase of the litigation will not be as uniform and simple as the liability phase, it is perfectly manageable, and does not affect predominance, as "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977).

### 3.    Aaron's' Arguments Against Finding That Common Issues Predominate Fail as a Matter of Law and Fact.

Aaron's' argument that predominance fails because of the supposed need for individualized determinations as to whether class members' rent-to-own transactions were "consumer transactions" fails in light of its numerous admissions that its business is the sale of "consumer" goods to low and middle-income "consumers."[9]  These admissions are corroborated by the sample customer files

---

[9] *See* Quirk Decl., Ex. D (Aaron's brochure to potential franchisees stating that "The typical leasing customer is an hourly wage job-holder earning a weekly paycheck and living in a rented house or apartment.  They owe little consumer debt, hold no real estate or financial instruments, have no savings account and function without credit cards.  They operate on a cash and carry basis."); *id*., Ex. C (Aaron's 2012 10-Q report filed with the SEC stating "We believe that… the limited number of retailers that focus on credit installment sales to lower and middle income consumers and increased

produced by Aaron's in discovery, showing only one non-natural person listed as the consumer.  See discussion at Section I.C.1., *supra.*

Moreover, this argument would apply to every case brought under RISA and TCCWNA, as well as numerous federal statutes that cover transactions for "personal, family, and household purposes" such as the FDCPA and TILA (see discussion at section I.C.1., *supra.*) and thus would strip New Jersey consumers of their ability to vindicate their rights under these statutes through a class action. Not surprisingly, most courts that have addressed this type of argument against class certification have rejected it. *See*, *e.g.*, *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1167 (7th Cir. 1974);  *Perry v. Beneficial Finance Co.*, 81 F.R.D. 490, 496 (W.D.N.Y. 1979); *Passeggio v. Cosmetique Inc.*, 1999 U.S. Dist. LEXIS 7607, 24-25 (E.D.N.Y. Apr. 30, 1999), and cases cited therein. See also *Lewis v. Riddle*, 1998 U.S. Dist. LEXIS 20465, 10 (WD La., 1998)(taking contrary position, and acknowledging that "The court realizes that a review of the published decisions may indicate that it is in the minority in not certifying a class based on concerns as to how this issue will be resolved.")   In these cases, the courts rejected that notion that where, as here, the vast majority of transactions are consumer transactions, predominance is not defeated by the possibility of a few possible business transaction.  For example, in *Haynes*, the Court explained,

> the defendant argues… that some purchases were made for commercial rather than personal purposes…  While we need not decide these points at this time, there is no indication that the commercial users of credit at this retail home furnishings

---

consumer credit constraints during current economic conditions have created a market opportunity for our unique sales and lease ownership concept…We believe that the segment of the population targeted by our sales and lease ownership division comprises approximately 50% of all households in the United States and that the needs of these consumers are generally underserved.")

establishment are other than minimal in the overall picture.   Such
commercial purchases would frequently be readily identified by
the listing of the name of the business as the purchaser in the
contract.  Even if it is necessary to review the contracts
individually to eliminate business purchases… "such a task would
be neither herculean, inhibiting, nor for that matter . . . unique."

*Haynes* at 1167, *quoting Beard v. King Appliance Co.*, 61 F.R.D. 434, 438 (E.D.
Va. 1973) (internal citations omitted).

### B.   A Class Action is Superior to Other Methods of Proceeding, as There is No Realistic Alternative to a Class Action for Class Members' Small-Value Statutory Claims.

Rule 23(b)(3)'s "superiority" requirement asks the Court "to balance, in
terms of fairness and efficiency, the merits of a class action against those of
alternative available methods of adjudication."  *In re Warfarin Sodium Antitrust
Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (citation omitted).  In determining
superiority, a court may consider the following factors: (1) the class members'
interests in individually controlling the prosecution or defense of separate actions;
(2) the extent and nature of any litigation concerning the controversy already
begun by or against class members; (3) the desirability of concentrating the
litigation in the particular forum; and (4) the likely difficulties in managing a class
action.  Fed.R.Civ.P. 23(b)(3).

Where "there are a potentially large number of class members" with "little
interest in 'individually controlling the prosecution or defense of separate actions,'
Fed. R. Civ. P. 23(b)(3) (A), because each consumer has a very small claim in
relation to the cost of prosecuting a lawsuit," *Warfarin Sodium, supra*, at 534, then
a class action is clearly superior to any other method of proceeding.  *See also In re
Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 351 (D.N.J.
1997) (class treatment preferred when "the recovery being sought by each of the

Plaintiffs is not sufficiently large to render individualized litigation a realistic possibility") (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985)). A class action is especially superior where, as here, the "targets" of the challenged practices are lower income consumers. *Casale v. Kelly*, 257 F.R.D. 396, 407 (S.D.N.Y. 2009) (In determining the superiority requirement of Rule 23(b)(3), "[i]t is appropriate for the court to consider the 'inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually.'" (quoting *Haynes v. Logan Furniture Mart*, 503 F.2d 1161, 1164-5 (7th Cir. 1974)).

Here, Plaintiff seeks certification of a Class of thousands of consumers who were charged relatively modest fees (the Service Plus Fee is 10% of the cash price of the goods and the "prorated amount" is less than a half-month's payment) in an allegedly unlawful manner. In fact, in many of the class members' transactions, the fees at issue are less than this Court's filing fee. Individual actions therefore are not a realistic alternative. *See, e.g., Carnegie v. Household Int'l, Inc.*, 376 F. 3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30"). This is especially true given Defendant's admitted target population is lower income consumers, who are extremely unlikely to be aware of their rights under laws like RISA, TCCWNA and the CFA or have the means to enforce them.

### C.   Aaron's' Arguments Against Finding Superiority Based on its Possible Assertion of Unspecified Counterclaims Against Class Members Fails as a Matter of Law and Fact.

In its preemptive motion, Aaron's claims that some Class members may be subject to counterclaims and setoff defenses similar to those it filed against

Korrow.[10]  These alleged counterclaims and defenses are entirely speculative, however, as Aaron's provides no factual information other than that its declarant "know[s] that there are numerous customers in New Jersey who have delinquent accounts, just like Ms. Korrow."  Harvey Decl. (Dkt. 45-2), ¶ 50.  Based on this barebones assertion, Aaron's argues that its mere threat of filing any counterclaims is sufficient to defeat a motion for class certification.  Aaron's thus tries to prospectively transform this case from a straightforward action seeking redress for statutory violations apparent on the face of Aaron's' contracts, over which the Court has original jurisdiction, into a mass of state-law collection actions *over each of which the Court has no original jurisdiction*.

Courts across the country have rejected the argument Aaron's makes here that threatened counterclaims against individual class members over which there is no original jurisdiction are grounds to deny class certification under Rule 23. Indeed, a majority of federal circuit courts to consider the issue have rejected this argument, declining to exercise supplemental jurisdiction over such counterclaims filed in response to claims over which federal courts have original jurisdiction.

The question of any outstanding liability that class members may owe on their contracts with Aaron's is unrelated to Aaron's' liability for the statutory violations alleged in the class action complaint, and is more properly addressed in the damages phase of this proceeding.  *Baby Neal*, *supra*, 43 F.3d at 57.  Further, the Court has broad authority to ensure that the relief afforded is equitable with

---

[10] Aaron's has identified its threatened claims against the absent class members as "counterclaims and set-off defenses."  *See, e.g.,* Aaron's Brief at 40.  A "setoff" generally is characterized as "a defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."  *Black's Law Dictionary* (9th Ed. 2009).  Because Aaron's' claims arise out of the same lease transactions forming the basis of Plaintiff's class claims, *see* Aaron's Brief at 28, Aaron's' threatened defenses will be referred to as counterclaims below.

regard to individual class members who may owe a debt obligation.

### 1.  Aaron's' Speculative, Unfiled Counterclaims Cannot Be Used to Undermine Class Certification.

As an initial matter, Aaron's has not submitted any evidence concerning whether it already has filed individual collection actions against any putative class members, in which case it would be barred from raising such claims in this action. Aaron's may have brought individual collection actions in the Small Claims Section of the New Jersey Superior Court, as it did against Korrow, or it may have sold the debt for collection to a third party to obtain a judgment in its own name. In either case, if any of Aaron's' threatened counterclaims are the subject of a final adjudication in State Court, Aaron's is not permitted to relitigate those collection actions as counterclaims to Plaintiff's class claims. Aaron's asserts that it generally does not file such collection actions against individuals. Harvey Decl. (Dkt. 45-2), ¶ 54. However, the only record evidence relating to its collection practices shows that it did in fact file a collection action, against Korrow.

As to the threatened counterclaim itself, Aaron's fails to articulate whether the claim would be brought on a class-wide basis or as individual claims against class members. If brought on a class basis, Aaron's must demonstrate that the counterclaim, like all class claims, satisfies all requirements of Fed. R. Civ. P. 23. Aaron's has provided no evidence that its speculative counterclaim could satisfy these requirements. Aaron's asserts that "numerous" customers have delinquent accounts, but then admits that it has not investigated these accounts to determine whether these customers owe money. Harvey Decl. (Dkt. 45-2), ¶¶ 50-51.

Regardless of the form of the unfiled counterclaim, important policy arguments, and several published decisions, counsel against permitting Aaron's to raise the specter of an unfiled collection counterclaim as a means to attempt to

defeat class certification.

Courts have continually looked with disfavor on "hypothetical" counterclaims that are raised solely in response to the filing of a class action complaint as a means to oppose class certification, dismissing such claims as mere "sabre-rattling" or a "tactical device" to encourage plaintiffs to opt out.  In *Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008), the court stated that "hypothetical counterclaims do not impact class certification, particularly where the record provides no basis for finding that such counterclaims would create difficulties that outbalance the advantages of class treatment."  Id. at 183; *see also*, *Johnson v. Aronson Furniture Co.*, 1998 U.S. Dist. LEXIS 14454, 1998 WL 641342 (N.D. Ill. Sept. 11, 1998) ("We decline to exercise jurisdiction over Aronson's threatened counterclaims for debt collection against Johnson and all putative plaintiffs in default…"); *O'Sullivan v. Countrywide Home Loans, Inc.*, 202 F.R.D. 504 (S.D. Tex. 2001), ("The mere prospect of speculative counterclaims does not defeat certification."), *rev'd on other grounds*, 319 F.3d 732 (5th Cir. 2003).  The *Allen* court stated that it was "not persuaded by the defensive 'sabre-rattling' that such counterclaims, even if they in fact exist, cause a conflict between class members…"  *Allen*, 249 F.R.D. at 183; see also *Donson Stores, Inc. v. American Bakeries Co.*, 58 F.R.D. 485, 489 (S.D.N.Y. 1973) ("…the right to counterclaim is readily subject to abuse as a tactical device to encourage plaintiffs to opt out.").

The *Allen* court distinguished cases such as *Heaven v. Trust Co. Bank*, 118 F.3d 735 (11th Cir. 1997), cited in Aaron's' Brief at 42, noting that "in *Heaven*, the court pointed to the manageability problems caused by counterclaims *that had already been filed*." *Allen*, 249 F.R.D. at 183 (emphasis in original); *cf. Heaven*, 118 F.3d at 738, *citing Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978), aff'd, 445 U.S. 236, 100 S. Ct. 1166, 63 L. Ed. 2d 427 (1980), ("The former Fifth

Circuit held that denial of class certification based on speculation regarding the potential assertion of counterclaims was an abuse of discretion…. In this case, the district court below engaged in no such speculation.") (internal citation omitted).

In addition, important policy considerations underlying the Federal Rules of Civil Procedure counsel against allowing Aaron's to raise the specter of yet-unfiled counterclaims to defeat class certification. "The objectives of Rule 23 class actions are to promote: (1) judicial economy (2) access to judicial relief (3) deterrence of unlawful conduct." Newberg on Class Actions § 4.34, at 2-306 (4th Ed. 2002). "Assertion of counterclaims against absent class members is inconsistent with all three of these objectives…. It is generally recognized that allowing counterclaims against Rule 23(b)(3) class members will discourage their participation in the class suit and will encourage option out, thus nullifying all three objectives of Rule 23." *Id*.; *see also, Johnson*, *supra,* 1998 U.S. Dist. LEXIS 14454 at *18 ("exercise of jurisdiction over the threatened counterclaims would create 'a tremendous chilling effect' on the private enforcement of TILA and the Illinois and Consumer Fraud and Deceptive Trade Practices Act thereby impairing the objectives of these statutes."); *Channell v. Citicorp*, 1996 U.S. Dist. LEXIS 14506 at *8, 1996 WL 563536 (N.D. Ill. September 27, 1996) (Aaron's' state-law debt collection counterclaim "would create a tremendous 'chilling effect' over the private enforcement of the [Consumer Leasing Act], thereby seriously impairing the congressional objectives which led to the passage of this legislation.").

The legislative objectives behind the statutes underlying Korrow's claims are similar to those addressed in *Johnson* and *Channell*. Both TCCWNA and the CFA provide private rights of action and payment of attorney's fees for successful claims. N.J.S.A. 56:12-17; N.J.S.A. 56:8-19. The CFA's treble damages and fee-shifting provisions were enacted to provide "easier access to the courts for the consumer, increase the attractiveness of consumer actions to attorneys and also

46

help reduce the burdens on the Division of Consumer Affairs" by promoting increased private enforcement of the Act. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15, 647 A.2d 454, 460 (1994) (quoting Governor's Press Release for Assembly Bill No. 2402, at 2 (June 29, 1971)).

Korrow's claims arise out of certain fees and charges imposed on the face of Aaron's' form contracts.  In this way, her claims are analogous to the contract disclosure-based Truth in Lending Act, Consumer Leasing Act, and related state law claims raised by the plaintiffs in *Johnson* and *Channell*.  Allowing Aaron's to do nothing more than threaten to pursue a collection action against individuals with valid causes of action under TCCWNA and the CFA would seriously undermine the purposes for which the New Jersey legislature enacted these statutes, and would create a "chilling effect" on private enforcement.

Moreover, in the present action, Aaron's has either already pursued an individual collection action against putative class members alleged to be in default, or it has voluntarily abandoned such collection efforts.  Aaron's' allegation that it is compelled to bring a counterclaim in response to the pending class claims is addressed in the following section.

## 2.   Aaron's' Threatened Counterclaim is Not Compulsory.

Relying on the Declaration of its Vice President of Operational Support, Aaron's argues that it is "compelled to assert its counterclaim" against Plaintiff and all absent class members who allegedly owe debts to Aaron's.  Harvey Decl. ¶ 54. Aaron's then cites several cases in its brief in support of its assertion that its threatened counterclaims against the absent class members are compulsory. Aaron's Brief at 41.  However, the views expressed in these cases are in a clear minority among courts that have considered whether state-law debt collection counterclaims filed in response to consumer protection actions are compulsory

under Fed. R. Civ. P. 13(a).  Specifically, at least four federal appellate courts have rejected this argument and held instead that such debt collection counterclaims are permissive.  *See Cabrera v. Courtesy Auto, Inc.*, 192 F. Supp. 2d 1012, 1019 (D. Neb. 2002) (summarizing federal Circuit court decisions); *Peterson v. United Accounts, Inc.*, 638 F.2d 1134, 1136 (8th Cir. 1981) (state-law collection counterclaim to complaint alleging Fair Debt Collection Practices Act violations is not compulsory).

The Third Circuit does not appear to have directly addressed the issue of whether state-law collection counterclaims are compulsory or permissive. However, at least one District Court in the Third Circuit has expressly adopted the majority view, and others have held that debt collection counterclaims are permissive rather than compulsory.  *Brady v. C.F. Schwartz Motor Co.*, 723 F. Supp. 1045, 1049 (D. Del. 1989) (holding plaintiff's TILA counterclaim permissive in state court collection action); *see also Ayres v. National Credit Mgmt Corp.*, 1991 U.S. Dist. LEXIS 5629 at *14 (E.D. Pa. 1991) (declining to exercise supplemental jurisdiction over collection counterclaim in individual Fair Debt Collection Practices Act action).

Accordingly, the majority view in this Circuit and among others is that debt collection counterclaims are not compulsory in response to federal actions seeking redress for statutory violations.  In fact, some courts and commentators have found Fed. R. Civ. P. 13 to be entirely inapplicable to class actions.  The Federal Rules of Civil Procedure direct a responding party to file a counterclaim against an "opposing party" when that claim "arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim," and "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a).  However, absent class members are not deemed "opposing parties" under Rule 13(a).  In *Donson Stores, Inc. v. American Bakeries Co.*, *supra*, the

48

court held that "…Rule 23 contemplates an adversary contest involving only the representative members of the class, with all other members of the class being permitted passively to await the outcome of the principal suit…. Therefore, in the absence of any reported decision holding that absent class members are parties for the purposes of Rule 13, I hold that they are not." 58 F.R.D. at 489; *see also*, *Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 at n. 15 (2d Cir. 1978), *aff'd* 444 U.S. 472 (1980) ("Absentees are not considered parties against whom counterclaims under Fed. R. Civ. P. 13 may be asserted …"); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 349 (E.D. Pa. 1976) ("This Court is convinced that *Donson* states the correct rule and, therefore, all counterclaims that purport to state a cause of action against unnamed class members must be dismissed."), *rev'd on other grounds*, 579 F.2d 13 (3d Cir. 1978).

One commentator has argued that "Courts may properly conclude that Rule 13 is inapplicable when a class action is involved," in part because "[A]bsent class members neither commence class actions nor usually exercise any meaningful control over the course of the class litigation…. Thus, class members do not fill the role that this aspect of Rule 13 was designed to afford." Newberg on Class Actions, *supra*, § 4:34 at 2-305.

Further, absent class members are entitled to due process protections with regard to the counterclaims threatened by Aaron's. "[P]rocedural due process standards mandate that counterclaims against individual class members, if permitted, can only be valid if the court has personal jurisdiction and venue over the countersued absent class member, who also must be served with counterclaim papers so that the class member can individually defend against the counterclaim." Newberg on Class Actions § 4.34 at 2-303.

Accordingly, both the plain text of the Federal Rules and the policies underlying these Rules demonstrate that Aaron's is in no way compelled to bring

any counterclaims against the putative class members for deficiencies on the underlying lease agreements.  Aaron's would not be precluded from bringing individual collection actions against class members in state court when those collection claims were neither litigated nor determined in the class action.  *See generally, Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("A judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment.").

### 3.   Even if They Were Filed, the Court Should Decline to Exercise Jurisdiction Over Any State-Law Counterclaim.

In attempting to convince the Court to deny Plaintiff's motion for class certification based on an unfiled and unarticulated counterclaim, Aaron's has impliedly requested that the Court exercise supplemental jurisdiction over its state law collection action(s).  However, the very reasons that Aaron's has identified in support of its position that the threatened counterclaim would "destroy[] predominance," Aaron's Brief at 41, have been recognized by federal statute and federal courts as important justifications for a court to deny supplemental jurisdiction over such counterclaims.

The Court has original jurisdiction over Plaintiff's claims pursuant to Aaron's' application under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  In contrast, Aaron's' threatened counterclaims have no independent federal jurisdictional basis, and are instead based on state contract law.  These collection claims normally would be brought in state court, as evidenced by Aaron's' collection action filed against Ms. Korrow in the Superior Court of New Jersey.

In order for Aaron's' state contract law claims to be entertained by a federal court, Aaron's must plead sufficient grounds for the federal court to adjudicate

such claims under the federal supplemental jurisdiction statute, 28 U.S.C. § 1367. This statute provides that federal courts may exercise supplemental jurisdiction over all claims "that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, even when the claims do form part of the same case or controversy, the exercise of supplemental jurisdiction is not mandatory, and the statute further provides:

> (c)  The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
> (1)  the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3)  the district court has dismissed all claims over which it has original jurisdiction, or
> (4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

In *Channell v. Citicorp National Services*, 89 F.3d 379 (7th Cir. 1996), the court addressed the grounds for declining to exercise supplemental jurisdiction in the context of a counterclaim filed in a consumer class action matter.  The court determined that, although the  counterclaim was part of the same case or controversy as the plaintiff's class claims, the fact "[t]hat a counterclaim falls within the outer boundary of § 1367(a) is not the end of matters…"  *Id.* at 386. The court noted that two of the four situations identified in §1367(b) may apply to authorize the District Court to decline to exercise jurisdiction over the counterclaim:

> Calculation of the sum due under each lease, and adjudication of defenses specific to particular lessees, may be considerably more time consuming than the adjudication of the class's claims under the Act….

> To put this in the statutory language: Citicorp's counterclaim may
> "substantially predominate[] over the claim or claims over which the
> district court has original jurisdiction." 28 U.S.C. §1367(c)(2).  Then
> there is §1367(c)(4): "exceptional" circumstances that provide
> "compelling" reasons to decline supplemental jurisdiction.  Citicorp's
> counterclaim recasts this case as a class action for damages, which
> although not unheard-of is certainly "exceptional."

*Id.* at 386-87.

The Seventh Circuit remanded the matter to the district court, which again

declined to exercise supplemental jurisdiction over the  counterclaim, finding that

the counterclaim "would transform this litigation into a virtual Pandora's Box of

96 separate collection actions which this Court is ill-equipped to handle," and thus

substantially predominating over plaintiff's class claims.  *Channell v. Citicorp*

*Nat'l Servs.*, *supra*, 1996 U.S. Dist. LEXIS 14506 at *6.  The District Court noted

that "state courts have set up special small claims courts that have streamlined and

cost-effective procedures specifically designed to handle these types of small

individual contract actions."  *Ibid.*  With regard to exceptional circumstances, the

District Court held that "the potential mass adjudication of claims against the

proposed class of lessees raises serious issues of fundamental fairness and

unnecessary personal jurisdiction issues."  *Id.* at *7-*8.

By Aaron's' own admission, the threatened counterclaims against class

members would "plung[e] this litigation into thousands of mini-trials," Aaron's

Brief at 40, and "would involve an extraordinarily time consuming, individualized

inquiry at the customer level."  Harvey Decl. ¶ 56.  Similar to the counterclaim

described in *Channell*, Aaron's' counterclaim would "recast[] this case as a

Aaron's class action for damages," substantially predominating over the claim to

which this Court has original jurisdiction, and creating an "exceptional"

circumstance warranting the declination of supplemental jurisdiction.  *Channell*, 89

F.3d at 386-387.

In asserting that it should be permitted to raise counterclaims against absent class members, Aaron's neglects to mention that each of these absent class members may have substantive defenses to Aaron's' contract claims, such as damaged goods, late delivery, or other claims related to Aaron's' performance of the contract.  Such claims and defenses relating to the performance of the contract would be much more efficiently resolved in the New Jersey courts that have specifically designed streamlined and cost-effective procedures in the Law Davison- Special Civil Part for resolving these types of disputes .

Accordingly, pursuant to 28 U.S.C. § 1367(c), the Court should decline to exercise supplemental jurisdiction over any counterclaim filed by Aaron's.

### 4. Even if Relevant, Aaron's' Claims Against Absent Class Members Would Be More Properly Addressed at the Damages Stage After Class-Wide Liability is Determined.

Aaron's' efforts to raise limitations on absent Class members' prospective recovery are at best premature, and are unrelated to its liability under TCCWNA or the CFA.  In applying for class certification, Korrow seeks the opportunity to demonstrate that Aaron's violated these statutes with regard to Class members. Only after Aaron's' liability is determined could the Court address whether absent Class members' rights to recover under the statutes are limited due to any affirmative defenses or counterclaims.  See *Roper*, *supra,* 578 F.2d at 1116 ("…the specter of large cost will materialize only if, after a preliminary hearing, it appears likely that damage are actually due a large number of class members…. Only then, after liability is determined, will there be a substantial cost…").

The Court has broad authority to approve a final disposition that equitably addresses relief for absent class members who may owe more on the underlying

contract than they are eligible to recover in the class claims.  See, *Channell*, 89 F.3d at 386 (discussing options for disposition of claims for class members who owed more than they were entitled to recover).  For example, class members could recover under TCCWNA and the CFA as an offset to prior or subsequent collection actions, or class members could receive cash, leaving Aaron's to file independent actions for any remaining contract obligation.  *Ibid.*  Such measures would further the legislative purposes of the statutes underlying Korrow's claims, while ensuring that Aaron's remains free to pursue any lawful collections against absent Class members.  Providing relief in the form of an account offset would not expose class members in default to any risk, and would not subject these class members to any counterclaims or other litigation that would not otherwise have been brought.  All Class members would receive a benefit, in the form of either payment to class members not in default, or a reduction in debt for class members in default.  Aaron's, if it chose to do so, would remain fully capable of pursuing any remaining debt from defaulted class members in the small claims courts designed specifically for such actions.  This type of relief for the class would in no way result in "the evasion of lawful debts."  *Channell*, *supra,* 89 F.3d at 386.

In *Roper v. Consurve*, *supra*, the court addressed a putative class of approximately 90,000 credit card holders who challenged the interest rates imposed by the defendant.  In opposing class certification, the defendant argued that it would face a tremendous burden in attempting to handle so many claims, and that it may wish to pursue counterclaims against defaulting class members.  The court found that the situation presented "a classic case for a Rule 23 class action," and, "[w]hile it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance."   578 F.2d at 1112.   The court cautioned that "the easiest way for any

court to handle complex class litigation is simply to deny certification; this may have the real effect of permitting a defendant to violate a federal statute either with impunity or minor expense." *Id.* at 1116.

### 5. Aaron's' Hired Expert's Arguments Against Finding Superiority are Equally Baseless.

To the extent the Court finds any of the Aaron's Expert Report of Joel Steckel, Ph.D. ("Steckel Report") (Dkt. 46-15) admissible, it should nonetheless reject his conclusions as baseless. Dr. Steckel theorizes that class certification of this action is not in the interests of Class members who owe Aaron's more than $100 because it allegedly would expose them to greater counterclaims (Steckel Report, ¶¶ 23-34), and is not in the interests of "repeat customers" because it allegedly would cause them to ***believe*** that Aaron's' prices will increase (*id.* at ¶¶ 35-43). The Court can and should reject both of these conclusions as a matter of law because the foregoing discussion demonstrates that Dr. Steckel's conclusion about exposure to counterclaims (*whose existence is not determined by this lawsuit*) is legally erroneous, as is his notion that the legal interests of presently injured class members must be subordinated to the financial interests of future customers. *Cf. Wetzel*, *supra*, 508 F.2d at 247-48 ("The interests of Wetzel and Ross in combatting the sexually discriminatory policies of the Company surely are coextensive with all female technical employees, whether formerly or presently employed. We do not perceive any interests of the former employees antagonistic to those of the present employees.").

The Court also should reject Dr. Steckel's analysis as a *factual* matter, as his report is little more than a book report based on no scientific inquiry other than a review of two or three other studies. Wolfe Decl., <u>Ex. H</u> (Deposition of Joel Steckel ("Steckel dep.")) at 43:16-47:24 (no survey, no experiment, no conjoint

analysis, no multi-dimensional scaling, no logit models, no preference testing, no hedonic pricing analysis; just a "content review" of Korrow's deposition, and a "secondary data analysis" based on a single telephone call held *after his report was filed*).  More fundamentally, Dr. Steckel relies upon assumptions that do not stand up to even minimal scrutiny.

For example, when confronted with factors besides this lawsuit that may bear upon Aaron's' pricing, such as the proximity of a competitor's stores, Dr. Steckel admitted that he could not assess the likelihood that Aaron's actually would increase its prices because of this lawsuit.  *Id.* at 76:1-77:22 ("No.  I was looking at is from the perspective of consumers.  *I didn't look at it from what Aaron's would do.*"); 77:25-82:20 ("Q.  And how much would the customer, the Aaron's customer think prices are going up because of this lawsuit?  A.  *I don't know.*").

Likewise, with respect to Class members' alleged exposure to counterclaims, Dr. Steckel again admitted that he cannot assess the likelihood that Aaron's would try to collect on any counterclaim (*id.* at 176:9-180:24—"Q.  So you don't know what they would do, do you?  A.  *I don't know what they would do.*"), despite having made the likelihood of an alleged consequence's occurrence a centerpiece of his Report's analysis.  *See* Steckel Report, ¶ 16; *see also* Wolfe Decl., Ex. H (Steckel dep.), at 178:14-24.  In short, Dr. Steckel's Report adds nothing of value to the Court's consideration of the Rule 23 class certification issues presented, and thus should be ignored to the extent it is not stricken.

## **CONCLUSION**

For all of the reasons set forth herein, Plaintiff's Cross-Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3) should be granted, and Defendant's preemptive Motion to Deny Class Certification should be denied.

<u>Dated</u>: February 5, 2013

Respectfully submitted,

s/ Henry P. Wolfe
Henry P. Wolfe, Esq.

Andrew R. Wolf, Esq.
Henry P. Wolfe, Esq.
Daniel I. Rubin, Esq.
The Wolf Law Firm, LLC
1520 U.S. Hwy 130 – Suite 101
North Brunswick, NJ  08902
Tel: (732) 257-0550; Fax: (732) 257-5654

Michael J. Quirk, Esq. (*pro hac vice*)
Berns Weiss LLP
100 North 18th Street, Suite 300
Philadelphia, PA 19103
Tel: (267) 202-0749
Fax: (818) 999-1500

Christopher J. McGinn, Esq.
Law Office of Christopher J. McGinn
75 Raritan Avenue – Suite 220
Highland Park, NJ 08904
Tel: (732) 937-9400
Fax: (800) 931-2408

Mark R. Cuker, Esq.
Joseph Venti, Esq.
Williams Cuker Berezofsky, LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Tel: (856) 667-0500
Fax: (856) 667-5133

*Attorneys for Plaintiff and the putative class*